# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47408

|  |  |  |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, May 2021 Term |
| | ) | |
| v. | ) | Opinion Filed: June 28, 2021 |
| | ) | |
| TOMAS DANIEL GARCIA-ONGAY, | ) | |
| | ) | Melanie Gagnepain, Clerk |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Elmore County. Nancy Baskin, District Judge.

The decision of the district court is reversed and remanded.

Eric D. Frederickson, State Appellate Public Defender, Boise, for Appellant. Justin M. Curtis argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. John C. McKinney argued.

———————————

BURDICK, Justice.

This case concerns whether a criminal defendant should have been permitted to conduct an investigation into the racial animus of a juror following a credible report that, prior to voir dire, the juror expressed an intention to convict on the basis of race. Tomas Daniel Garcia-Ongay appeals from his judgment of conviction for lewd conduct with a minor under the age of sixteen. After Garcia-Ongay's conviction, the Elmore County Jury Commissioner informed the district court of his concerns that a juror in the trial had expressed clear racial bias when he was summoned for jury duty. In light of this information, Garcia-Ongay moved for a new trial and requested that the district court grant permission for him to investigate whether racial animus tainted the jury's deliberations. The district court denied the motion and the accompanying request. On appeal, Garcia-Ongay contends that the district court abused its discretion in denying his request for further investigation, arguing that the United States Supreme Court's holding in

1

*Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), permits such an inquiry. For the reasons below, we reverse the district court and remand for further proceedings.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On March 9, 2017, a jury convicted Garcia-Ongay of lewd and lascivious conduct with a minor under sixteen years of age. The following day, the Elmore County Jury Commissioner emailed the district court, bringing to its attention pretrial statements made by a juror in Garcia-Ongay's trial. Specifically, the email stated:

> This morning I realized that there may be an issue regarding one of the impaneled jurors on the Garcia-Ongay trial, [Juror #9].[1]A while back when he received his summons he contacted me saying that he was a convicted felon. As it turns out he was successfully discharged from probation without any issues, and therefore a qualified juror in Idaho. Needless to say that was not what he wanted to hear, and he responded with something to the effect of "I hope I get put on a trial with a Mexican so I can find them guilty, and I hope that Trump builds that wall."
>
> I often get jurors that say things similar to this, and I generally just assume that they're trying to get out of jury duty and I doubt they genuinely feel this way. However, the fact that the defendant was Hispanic and he was found guilty is concerning. Additionally, I didn't listen to the entirety of voir dire, and don't know for certain whether or not he mentioned his conviction. I thought I should bring this to your attention.

Based on this email, Garcia-Ongay moved for a new trial, arguing that the reported statements by Juror #9 called into question the validity of his conviction under the U.S. Supreme Court's holding in *Peña-Rodriguez*. The district court heard oral argument on the motion on February 12, 2018. At that time, Garcia-Ongay's defense counsel clarified his position with respect to the motion for a new trial, stating that a new trial is "the eventual outcome of what we want[,] [b]ut before we get there . . . my desire would be to . . . interview the jurors or have them interviewed by an investigator or brought before the court for an in-camera interview about this bias." Defense counsel conceded that there was not yet evidence of any prejudicial remarks made during deliberations but argued that under *Peña-Rodriguez* he should be permitted to "interview these jurors and find out what, if anything, may have been said in deliberations."

The district court took the matter under advisement and issued a written decision and order denying Garcia-Ongay's motion and request for further investigation on September 6, 2018. The district court reasoned that Juror #9's comments did not necessitate an investigation of

---

[1] Although the Jury Commissioner identified the juror as juror number five in his email, we refer to the juror by the number assigned during voir dire.

jury deliberations because the statement was unsworn and occurred more than a month before trial. Further, the district court noted that Juror #9 did not make any statements during voir dire indicating racial bias, nor did any other jurors come forward after trial to indicate that Juror #9 made racist statements during deliberations. As a result, the district court denied Garcia-Ongay's motion for a new trial and oral motion for an investigation into potential racial animus in the jury's deliberations.

Garcia-Ongay timely appealed.

## II.    ISSUES ON APPEAL

1. What standard applies to a post-verdict request for juror contact to investigate potential racial animus?

2. Did the district court abuse its discretion in refusing to allow Garcia-Ongay to conduct an investigation into racial animus in the jury's deliberations?

## III.    STANDARD OF REVIEW

A trial court's decision to permit post-verdict discovery of jurors is reviewed according to an abuse of discretion standard. *See, e.g.*, *Hall v. State*, 151 Idaho 42, 45, 253 P.3d 716, 719 (2011). Under that standard, this Court asks "whether the district court '(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.'" *State v. Hess*, 166 Idaho 707, 709, 462 P.3d 1171, 1173 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 873, 421 P.3d 187, 204 (2018)).

## IV.    ANALYSIS

### A. Garcia-Ongay must demonstrate good cause to believe that racial animus tainted the jury's deliberations to conduct a post-verdict investigation of any juror misconduct.

As a preliminary matter, we address the appropriate standard to apply to Garcia-Ongay's request for an investigation into racial animus in the jury's deliberations. The district court appears to have applied the two-part test for whether a defendant is entitled to a new trial based on juror misconduct from *State v. Seiber*, 117 Idaho 637, 791 P.2d 18 (Ct. App. 1989). That test requires (1) the defendant prove by clear and convincing evidence that juror misconduct occurred and (2) the trial court is convinced the "misconduct reasonably could have prejudiced the defendant." *Id.* at 640, 791 P.2d at 21. In contrast, Garcia-Ongay requests that this Court apply the "good cause" standard from *Hall* to his request to interview jurors after the trial. That

3

standard permits questioning the jury where good cause exists, suggesting that juror misconduct occurred. *Id.* at 50, 253 P.3d at 724. In its briefing, the State appears to take both positions, arguing that "Garcia-Ongay failed to meet his burden of showing 'good cause'" for the investigation, while also incorporating by reference the district court's analysis with respect to the two-part test for a new trial based on juror misconduct. During the oral argument on appeal, however, the State conceded that the district court applied the wrong test and argued under the good cause standard.

We hold that the good cause test from *Hall* is the appropriate standard to apply in ruling upon motions such as the motion being appealed in this case. After the Jury Commissioner's email, Garcia-Ongay made two discrete requests of the district court: (1) that the district court grant permission to interview or otherwise investigate whether there was racial animus in the jury's deliberations, and (2) that the district court grant Garcia-Ongay's motion for a new trial based on a juror's improper racial animus. The district court applied the standard appropriate for the second request, but it is the denial of the first request that forms the basis of this appeal. Accordingly, the proper inquiry is whether Garcia-Ongay demonstrated good cause to suggest the jury's deliberations were tainted by impermissible racial prejudice. *See Hall*, 151 Idaho at 50, 253 P.3d at 724.

## B. The district court abused its discretion in denying Garcia-Ongay's request for an investigation into racial animus in the jury's deliberations.

To begin, we discuss the precise nature of the question before this Court. Clearly defining that question informs the scope of our analysis and the focus of our inquiry. To that end, we have not been asked, nor do we decide, whether Garcia-Ongay has presented evidence entitling him to a new trial. Rather, we have only been asked to determine whether the district court abused its discretion in denying Garcia-Ongay's motion for post-verdict juror contact to investigate potential racial prejudice in the jury's deliberations.

As to that question, both parties agree that Idaho Rule of Evidence 606(b) is the starting point of our analysis. Rule 606(b)[2] provides, in pertinent part:

> (1) . . . During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the

---

[2] Garcia-Ongay made his motion for a new trial and accompanying request for an investigation after the adoption of a revision to I.R.E. 606(b) but before the effective date of the revised rule. The district court issued its decision and order after the effective date of the revision and used the new version of the rule in its analysis. We cite to the current version of the rule because the substantive portions of the rule applicable to this case are unchanged.

4

jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.

The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) the jury determined any issue by resort to chance . . . .

I.R.E. 606(b). This is Idaho's embodiment of the common law "no impeachment rule," which bars jurors from calling into question the validity of a verdict with testimony about their deliberations. *See Peña-Rodriguez*, 137 S. Ct. at 863–65 (discussing the common law origins of the no impeachment rule and the various jurisdictional approaches to that rule).

In *Peña-Rodriguez*, the Supreme Court examined whether the no impeachment rule, as embodied in Colorado Rule of Evidence 606(b), prevented a trial court from considering two juror affidavits that another juror made racist statements during deliberations. 137 S. Ct. at 862–63. The Supreme Court weighed the history and purposes of the no impeachment rule against its jurisprudence seeking to eliminate racial discrimination from the administration of justice. *Id.* at 868. On one hand, the Supreme Court reasoned that the no impeachment rule promoted full and free deliberations among jurors because of the assurance that they would not be haled back into court to discuss their deliberations after being discharged. *Id.* at 865. Moreover, the Supreme Court emphasized the importance of the no impeachment rule in providing not only finality for jurors, but finality for verdicts as well. *Id.* On the other hand, the Supreme Court recognized that even the perception of race-based animus in the jury system "damages . . . the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Id.* at 868 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Ultimately, the Supreme Court held that the no impeachment rule has a constitutional exception, rooted in the Sixth and Fourteenth Amendments, which allows a trial court to consider evidence of racial animus in jury deliberations "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id.* at 869.

In reaching its holding, the Supreme Court reasoned that the traditional safeguards against juror misconduct, such as voir dire and jurors' reports of misconduct, were not always

5

effective at rooting out racial animus. *Peña-Rodriguez*, 137 S. Ct. at 868–69. For instance, it noted that it is unlikely that general questions concerning bias asked during voir dire would expose racial prejudice, and targeted, specific questions may only inflame such bias without revealing it. *Id.* at 869. In other words, the likelihood that a prospective juror would openly admit in front of his peers that he is bigoted is slim, and asking each juror specifically about racial bias may only deepen feelings of racial animus without exposing them. Similarly, the Supreme Court expressed doubt at the potential for juror reports of misconduct to effectively combat racial animus because such reports, while useful, may be self-censored by concerned jurors due to the social stigma that attends calling another juror a racist. *Id.* Thus, the Supreme Court buttressed its holding, reasoning that additional precautions are necessary to engender confidence in the jury system by eliminating actual and perceived racial bias in deliberations. *Id.*

We have not had the occasion to apply *Peña-Rodriguez* to Idaho law. We have, however, emphasized the importance of purging racial discrimination from the jury system in other contexts. *See State v. Ish*, 166 Idaho 492, 500, 461 P.3d 774, 782 (2020) ("The Equal Protection Clause requires a criminal trial free from racial discrimination in the jury-selection process."). Accordingly, we approach the issue in this case mindful of "[t]he unmistakable principle . . . that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice'" *Peña-Rodriguez*, 137 S. Ct. at 868 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)).

Here, unlike *Peña-Rodriguez*, the question before us does not concern whether the district court could properly *consider* evidence of racial animus in the jury's deliberations despite the no impeachment rule set forth in I.R.E. 606(b). Instead, we are asked to decide whether I.R.E. 606(b) proscribes contacting jurors after the verdict to *obtain* evidence of potential racial animus in the jury's deliberations. In other words, does I.R.E. 606(b) prohibit post-verdict juror contact to discover potential race-based misconduct?

To that end, we have already answered a similar question in *Hall*. There, we considered whether a district court abused its discretion in denying a defendant's motion for a post-verdict juror interview seeking to investigate juror misconduct during his trial. *Hall*, 151 Idaho at 48–49, 253 P.3d at 722–23. The district court limited its review of the defendant's motion to whether the defendant would be able to discover admissible testimony under I.R.E. 606(b). *Id.* at 50–51, 253 P.3d at 724–25. Ultimately, the district court concluded there was no evidence that the defendant

would be able to discover testimony admissible under I.R.E. 606(b) and denied the motion. *Id.* This Court concluded that limiting the scope of a motion for juror contact to only those topics on which a juror could permissibly testify under I.R.E. 606(b) was erroneous. *Id.* at 51, 253 P.3d at 725. We reasoned that "[t]he goal in limiting contact with the jury is not to unduly restrict the discovery of evidence suggesting juror misconduct, but rather to protect jurors from unwanted contact and potential harassment." *Id.* at 50–51, 253 P.3d at 724–25. Accordingly, we held that "[t]he appropriate test is whether . . . there was good cause to believe that juror misconduct had occurred . . . [and] [i]f such a showing was made the court should have permitted juror contact, limited to the subject of such misconduct, irrespective of whether that contact would lead to admissible juror testimony." *Id.* at 51, 253 P.3d at 725.

Viewing the above as a whole, we recognize that in cases like this one there are multiple standards that may be employed sequentially where a credible allegation of potential racial animus in the jury's deliberations has been made. Therefore, a trial court must be cognizant of the multiple steps that could attend a defendant's motion for a new trial in order to apply the correct standard at the correct time.

First, where a defendant learns that a juror made pretrial statements exhibiting racial animus, as is the case here, he may request the trial court to permit a post-verdict investigation to gather evidence in support of a motion for a new trial. Indeed, *Peña-Rodriguez* contemplates the ability of a defendant to conduct such investigations subject to a local standard, stating "[t]he practical mechanics of acquiring and presenting" evidence of race-based discrimination in deliberations are "shaped and guided" by local rules limiting post-trial contact of jurors. 137 S. Ct. at 869. As to those local rules, in Idaho the *Hall* standard is the appropriate test for a trial court to apply when considering a defendant's request for post-verdict juror contact for the purpose of gathering evidence of juror misconduct. Under that standard, a defendant must demonstrate by a preponderance of evidence good cause to believe that such misconduct occurred in order to conduct a post-verdict investigation. However, a post-verdict investigation is not a requirement, and the need for such an investigation may not arise if the defendant already has evidence of racial animus in the jury's deliberations. *See Peña-Rodriguez*, 861–62 (defendant presented trial court with juror affidavits alleging race-based misconduct without a prior investigation into deliberations).

7

Next, when weighing whether to grant a defendant's motion for a new trial based on the evidence presented of juror misconduct, the trial court must apply the standard articulated in *Seiber*, which requires a defendant to prove by clear and convincing evidence that racial prejudice tainted jury deliberations and that such misconduct "reasonably could have prejudiced the defendant." 117 Idaho at 640, 791 P.2d at 21. In applying that standard, the trial court will almost certainly be asked to consider evidence that could be excluded by the no-impeachment rule articulated in Rule 606(b). It is in this context that application of the *Peña-Rodriguez* standard comes to the fore. Under these circumstances, a defendant may bring an as-applied constitutional challenge to Rule 606(b) on the basis of the constitutional exception to the no-impeachment rule described in *Peña-Rodriguez*. Thus, if the issue is raised to the trial court, it must consider whether the evidence presented is merely an "offhand comment indicating racial bias," which may be excluded, or "a clear statement that indicates [a juror] relied on racial stereotypes or animus to convict a criminal defendant," in which case Rule 606(b) must yield to the constitutional considerations discussed in *Peña-Rodriguez*.

To summarize, the *Hall* standard controls whether and when a defendant may contact jurors to investigate potential racial animus in jury deliberations and the standard described in *Seiber* governs a trial court's determination with respect to a motion for a new trial based on juror misconduct. In applying the latter standard, a trial court must consider evidence that could be excluded under Rule 606(b). However, a defendant may challenge the exclusion of that evidence under *Peña-Rodriguez*, which augers a constitutional exception into Rule 606(b) in certain factual circumstances.

In light of the above framework, we hold that the district court abused its discretion in denying Garcia-Ongay's motion to interview the jurors because it applied the wrong standard to the question before it. The district court recognized the issue was one of discretion, indicating, "it is within the trial court's discretion to determine whether racial animus motivated a decision." In addition, the district court acted within the boundaries of its discretion, considering and ruling only on the motions before it. Also, the district court reached its conclusion through the exercise of reason, thoroughly discussing the facts and legal issues before it. Nevertheless, we conclude the district court did not act consistently with applicable legal principles because it prematurely applied the standard for a motion for a new trial based on juror misconduct. The district court's analysis was based on the second step discussed above, set forth in *Seiber*, as opposed to the first

8

step, set forth in *Hall*. That is, the district court determined that there was no clear and convincing evidence of juror misconduct and that the allegations of prejudiced statements from Juror #9 did not satisfy the standard from *Peña-Rodriguez*. While we agree with the district court's reasoning that a single unsworn statement months before trial likely does not satisfy the *Peña-Rodriguez* standard, nor rise to the level of clear and convincing evidence of juror misconduct, the proper inquiry is whether the Jury Commissioner's email gave good cause to believe that race-based misconduct occurred during deliberations.

As to whether Garcia-Ongay carried his burden under the *Hall* standard, we hold good cause existed to indicate race-based juror misconduct might have occurred. First, the report of Juror #9's statement came from a highly credible source, the Elmore County Jury Commissioner, and was a clear indication of intent to convict on the basis of race. Second, the target of the racial animus demonstrated from Juror #9's statement coincides with the race of the defendant. Of course, the impact of this isolated statement is somewhat mitigated by the lack of any statement of bias during the limited voir dire of Juror #9, and that no juror stepped forward to allege that racial animus tainted deliberations. That being said, we are cognizant that these are the specific factors the Supreme Court indicated were of limited efficacy in rooting out racial bias in the administration of justice. *See Peña-Rodriguez*, 137 S. Ct. at 868–69. In any event, the good cause standard is a lower bar than the *Peña-Rodriguez* standard as it only concerns whether there is sufficient reason to believe that evidence which could satisfy the *Peña-Rodriguez* standard exists. Under these facts, we conclude that the benefit of the doubt cannot be given to Juror #9's alleged statement of intent to convict on the basis of race, and confidence in the administration of justice demands an investigation into whether Juror #9 made good on his promise. We commend the Jury Commissioner who, while under no legal or professional duty to report Juror #9's statements, saw fit to raise this troubling information with the district court. The Jury Commissioner's report served the Judiciary's mission to provide access to justice through the timely, fair, and impartial resolution of cases.

Inasmuch as we have concluded that good cause existed to justify an investigation into potential racial bias in the jury's deliberations, we must next discuss the proper scope of the investigation on remand. First, we hold that Garcia-Ongay may interview Juror #9 to determine if he relied on racial stereotypes or animus in reaching his guilty vote. Next, following that interview, we hold that it is within the sound discretion of the district court to determine how and

9

if Garcia-Ongay may contact other jurors in the case to investigate whether potential racial animus was present during their deliberations. In setting the scope of this investigation, the district court must "balance its legitimate goal of juror protection with the court's primary duty of ensuring that justice is done and that defendants receive fair trials." *Hall*, 151 Idaho at 51, 253 P.3d at 725. If this investigation yields evidence of racial animus in the jury's deliberations, and Garcia-Ongay renews his motion for a new trial, the district court may then properly apply Rule 606(b) and *Peña-Rodriguez* to decide if the evidence may be factored into its determination of whether a new trial should be ordered based on juror misconduct.

## V.    CONCLUSION

Based on the foregoing, we hold that the district court abused its discretion in denying Garcia-Ongay's request for post-trial juror contact because good cause existed to suggest that racial animus could have tainted the jury's deliberations. Accordingly, we remand the matter to allow Garcia-Ongay to interview Juror #9 and, in the discretion of the district court, contact the other jurors to investigate whether racial prejudice infected their deliberations.

Chief Justice BEVAN and Justices BRODY, STEGNER, and MOELLER **CONCUR.**