# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49266

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Boise, November 2023 Term** |
| | ) | |
| v. | ) | **Opinion filed: January 31, 2024** |
| | ) | |
| **GILBERTO FLORES RODRIGUEZ,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Appellant.** | ) | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Cassia County. Michael P. Tribe, District Judge.

The order of the district court is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Elizabeth Allred argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. John McKinney argued.

_____

MOELLER, Justice.

In 2021, a Cassia County jury found Gilberto Flores Rodriguez guilty of first-degree murder for the 1995 killing of a 14-year-old girl. Following the verdict, Rodriguez filed a motion for a new trial asserting multiple grounds for relief, which the district court denied. Rodriguez advances only one issue on appeal, maintaining that the district court abused its discretion in denying his motion for a new trial after information came to light that a juror may have slept through portions of the trial. Because Rodriguez has failed to establish by clear and convincing evidence that any juror misconduct occurred, we affirm the order of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In February 1995, 14-year-old Regina Krieger was reported missing from her home in Burley, Idaho. She was last seen by her father the previous evening before she went to bed. When her father came to wake her for school, Regina was gone and her bedspread was missing from her bed. Regina's father called 911 to report his daughter's disappearance and stated that "there was blood on the bedroom floor, and it looked like something had been dragged up the stairs" from her

1

basement bedroom. He also reported that there was "blood going up the stairs that led to the backyard of the residence." On investigating the Krieger property, deputies found the blood described by Regina's father. They also found a "pile of feces" near the back gate, where the blood trail ended.

Local law enforcement initially treated this as a missing-persons case, with the Cassia County Sheriff's deputies originally believing Regina may have run away. Several weeks later, Regina's body washed up on the banks of the Snake River. An autopsy determined that she had been killed weeks before. The cause of Regina's death was determined to be "a sharp laceration of the throat with severance of the right and left jugular veins and a stab wound to the chest with laceration of the left ventricle of the heart." There were signs of blunt force trauma received prior to death that may have rendered Regina unconscious, as well as a "defense wound" on her hand from potentially trying to ward off her assailant. Kerry Patterson, the pathologist who performed Regina's autopsy, later testified that Regina suffered "[a] sharp laceration, deep" across her throat "from ear to ear," and was then stabbed in the heart. Patterson explained: "Had [Regina] survived the laceration to the throat, [the stab wound] would have finished it."

The investigation then turned from a missing-persons case to a murder investigation. While Regina's death came close in time to other unsolved murders in the area, no arrests were made or charges filed for the next 25 years. After the Federal Bureau of Investigation ("the FBI") became involved in the case in 2016, three confidential witnesses provided information linking Rodriguez to Regina's death. Their statements ultimately resulted in Rodriguez being charged and arrested in February 2019. The three confidential witnesses provided information relating to (1) details of the night Regina was killed, (2) how her body was thrown into the Snake River from a bridge, and (3) various statements Rodriguez had made about killing Regina over the years since her initial disappearance in 1995. Rodriguez pleaded not guilty to the charge, and he has continued to maintain his innocence. While the State initially filed a notice of intent to seek the death penalty, it later withdrew this filing.

Because the murder weapon was never recovered, the only physical evidence presented by the State at trial concerned Regina's autopsy. There was DNA found on Regina's body from two unidentified males, but they did not match Rodriguez. Lacking physical evidence tying Rodriguez to the murder, the State relied instead on witness testimony, mainly from four key witnesses interviewed by Cassia County and the FBI: Cody Thompson, Carlos Rocha, Heather Ray, and

2

Carlos Tena. These witnesses are all currently incarcerated in various locations. None of them received plea bargains or reduced sentences in exchange for testifying against Rodriguez. Each stated that they came forward to testify against Rodriguez because it was the truth and the right thing to do.

Cody Thompson was the State's primary witness. Thompson and Rodriguez had been interrogated by law enforcement several times over the years and both had "told many versions of their involvement in [Regina's] death." Both men had also been "in and out" of prison since Regina's murder in 1995. Thompson was 16 years old when Regina was murdered and he attended the same high school. The record established that Thompson not only purchased drugs from Rodriguez at that time, but he also sold drugs and collected money for him.

At the trial, Thompson testified about the night Regina was killed and stated he was with Rodriguez throughout the evening. Thompson explained that he had gone to Rodriguez's home because law enforcement officers were looking for him. He was under the influence of methamphetamine, marijuana, and heroin that night, which left him feeling sick through much of the evening. Thompson testified that earlier that night, he and Rodriguez drove to the Aguinagas' residence, who were distant relatives of Rodriguez. Afterward, the two men drove to "an alley" behind a home. Rodriguez told Thompson to wait in the vehicle. Thompson said he waited in the car but "got sick," "puked outside of the car," and recalled defecating somewhere. Laboratory tests later found that Thompson's DNA matched the fecal evidence[1] found in the Krieger's backyard the day she disappeared.

When Rodriguez returned to the vehicle, Thompson saw Rodriguez wipe blood off his hands. There was also blood on his clothes. Rodriguez moved the car to the front side of the house, and then told Thompson to help him. The two men walked to the side of the house where there was "[a] body wrapped up in a blanket." There were no sounds or movements coming from the wrapped body. Thompson and Rodriguez carried the body to Rodriguez's car and placed it in the trunk. Thompson testified: "I was scared. I was terrified. I didn't know necessarily what to do, if I should run, from that moment or not." Thompson said Rodriguez next drove them back to the Aguinagas' home to wash up, change, and get rid of their bloody clothing. Afterward, he and

---

[1] The actual fecal waste collected from the crime scene was lost from evidence over the years. However, Regina's housecoat had also been found nearby, and "[i]t appeared that someone had wiped themselves twice with [the] housecoat." Thompson's DNA matched these fecal stains, placing him in the Krieger's yard that night.

Rodriguez took Regina's body to the Snake River, where they "threw" her body into the river. Thompson testified that it was only later, when he saw fliers about a missing person at a gas station, that he realized the body was Regina.

On cross-examination, the defense drilled Thompson on how his story has changed repeatedly over the years—even between the preliminary hearing proceedings and trial. Cross-examination also established that Thompson had accused others of murdering Regina over the years. Thompson has even varied on alleging that there was a third person in Rodriguez's vehicle the night of Regina's murder. Thompson admitted he had lied in the past and "made stories up" because he was afraid of what would happen, but stated that his testimony at trial was "the truth."

The State called additional witnesses who testified regarding allusions Rodriguez had made over the years to killing Regina. For example, Heather Ray testified that Rodriguez admitted to killing Regina, saying "he sliced her," while Carlos Tena recalled conversations over the years where Rodriguez described "getting rid of" a girl he called "Freddy Krueger." This was a reference, Tena said, to the murder of Regina Krieger. Tena also described a time where Rodriguez grew nervous and confided that "the feds were poking around again" or "the feds were on his tail" over "La Gina" or "la guereja," meaning "the white girl," which were additional references to Regina.

Rodriguez presented witnesses to contradict the inference that he had made statements somehow hinting at or suggesting that he was involved in the murder. Rodriguez did not testify, choosing to exercise his right to remain silent under the Fifth Amendment. The trial lasted six days. At the conclusion of the trial, on May 25, 2021, the jury returned a guilty verdict and convicted Rodriguez of first-degree murder.

In the weeks following his conviction, Rodriguez employed a private investigator to contact jurors and inquire as to "how and why the jury had arrived at its verdict in the face of the State's abject failure to prove its case beyond a reasonable doubt." Some of the jurors agreed to speak with the investigator in these post-verdict interviews, and the investigator reported back to defense counsel that Juror 341 "had been sleeping during much of the testimony and had to be awakened by the bailiff." The investigator reported that he met with the bailiff and confirmed that Juror 341 fell asleep during the trial and had to be awakened by her. There is no indication in the record that the investigator spoke with Juror 341.

4

Rodriguez then filed a motion for a new trial under Idaho Criminal Rule 34 and Idaho Code section 19-2406(6), asserting three grounds for a new trial: (1) the verdict was the result of juror misconduct; (2) the verdict was decided "by means other than fair expression of opinion on the part of all the jurors"; and (3) the verdict was contrary to law and evidence. Rodriguez also submitted an affidavit from the investigator containing his report and two affidavits from his attorneys averring that they neither observed nor had been informed of these circumstances during the trial. The State opposed this motion for a new trial, filing two declarations from prosecutors and arguing that Rodriguez failed to provide clear and convincing evidence of juror misbehavior.

An evidentiary hearing on the motion was held on July 15, 2021. The bailiff from the trial was the only witness who testified. During her direct examination by the defense, the bailiff testified that she "had to awaken" Juror 341 "two or three times."

> Q [by Defense]. And I believe that you told Investigator O'Neill that, during the course of the trial, on at least three occasions, you observed the juror concerned asleep, or appearing to be asleep, and you had to awaken him, correct?
>
> A. Yes, sir. I estimated it two or three times.
>
> Q. Okay. It may have been more; it may have been less?
>
> A. Yes, sir.
>
> Q. But certainly he did, to your observation, fall asleep?
>
> A. I believe for a short time.
>
> Q. And, again, I do not want to embarrass anyone or make any suggestion that I'm castigating anyone, but was that information relayed to the [c]ourt in any manner?
>
> A. Yes, sir. I believe the [c]ourt was aware.
>
> Q. And, again, without asking you to violate any confidentiality that you may feel, and I understand that entirely, did the [c]ourt instruct you to inform counsel of that fact?
>
> A. No.

During the State's cross-examination, the bailiff explained that she had asked Juror 341 if he was okay because she was aware Juror 341 was a diabetic and occasionally needed a recess to stabilize his blood sugar. During voir dire, Juror 341 had explained that his condition "sometimes . . . changes quick." The bailiff also clarified that she did not know if Juror 341 was actually asleep but believed he might be because his head was down and in his hands. During cross-examination by the State, the bailiff elaborated on her earlier testimony:

Q [by State]. Did you give any instruction or say anything to Juror No. 341 about what was going on, as far as their sleeping, or did you learn anything from that juror about their health condition?

A. I inquired. I asked him if he was okay because of the known health condition.

Q. What was that known health condition?

A. Diabetes.

Q. And did you actually observe how long, because you said you believe he was asleep for a short period of time, did you ever time it? Do you know how long he slept?

A. No.

Q. Do you know for a fact that he was asleep?

A. No.

Q. . . . Did he make any statements as to actually being asleep?

A. No.

Q. So, for the record, what exactly did you observe that juror doing that made you believe he might have been asleep?

A. If I recall correctly, he had his head down in his hands, like looking towards the desk or floor.

Q. Was there anything else -- was there audible snoring? Was there anything of that nature?

A. No.

Additionally, the bailiff testified that it was "impossible" for her to determine what testimony was being presented or "what was going on" in the proceedings at the times when she noticed Juror 341 lower his head. Rodriguez likewise argued before the district court that "it is impossible to know how many times Juror 341 fell asleep, what parts of the testimony he missed, what additional problems of attention he was experiencing, or, if he was asleep at all."

While the bailiff was the only witness called to testify at the evidentiary hearing, the district court also considered the additional sworn statements filed with the court. As noted, the defense team submitted three affidavits, two from the attorneys and one from the private investigator. The State also submitted declarations from the prosecution team, which sat across from Juror 341 during the course of the trial. Both prosecutors stated they never saw Juror 341 fall asleep, but occasionally saw Juror 341 lower his head. One deputy prosecutor explained:

3. Juror 341 was seated directly across from where I was seated at the prosecution table during the trial. I watched all the jurors during the course of the trial but it was particularly easy to see Juror 341 as he was seated directly across

6

from me in the jury box. I understand that it is alleged that he was sleeping during the court [sic] of the trial. I never once saw him sleeping. I did see him lower his head but he did that frequently and never left his head down for significant periods of time. His head was not resting on the table in front of him or on his hands. When he would lift up his head there were no signs that he had been sleeping. He did not yawn. His eyes were open and not red. His head was not bobbing or drooping as though he was falling asleep.

4. There was one time when I saw the bailiff enter the jury box and approach Juror 341 while his head was down. I could not hear if anything was said but Juror 341 immediately lifted up his head when the bailiff approached him and there were no indications that he had been asleep. After he was approached by the bailiff I never saw him put his head down again for more than a few seconds. Thus, any inattentiveness on the part of Juror 341 was immediately addressed by the bailiff during the trial.

In contrast, defense counsel stated in a hearing that "[f]rom the way that we were positioned, it was, at times, impossible to see all but the last two jurors," and they did not see a "sleep[ing]" juror during trial. Defense counsel stated: "we didn't see that, nor were we informed of that by the [c]ourt or by the bailiff." Juror 341 was never questioned, either during trial or following the verdict. The district court took the motion under advisement.

On August 18, 2021, the district court issued a written decision denying Rodriguez's motion for a new trial. It concluded that Rodriguez did "not present[] clear and convincing evidence that Juror 341 was asleep for any significant portion of the trial," or "that the conduct reasonably could have prejudiced the defendant." While the court noted that it had also observed Juror 341 "put his head down or nod off" three times during the trial, the bailiff always "made sure the juror was stirred in a timely manner." The court went on to explain its own observations from the trial:

On the first day of testimony, the [c]ourt and [c]ourt staff alerted the Bailiff of Juror 341 when the Juror placed his head on the table in the jury box because the [c]ourt was concerned that the Juror [341] may have been experiencing side effects of diabetes, which was discussed during the juror's individual voir dire. The Bailiff subsequently made contact with Juror 341 without prompting from the [c]ourt or [c]ourt [s]taff. The [c]ourt did not address the issue with the attorneys on the record because it was readily apparent what was happening in the courtroom (and the attorneys and attorney support staff were seated directly facing the jury box – a function of the courtroom being rearranged to accommodate social distancing of the jury and audience) such that the [c]ourt did not believe anyone in the courtroom had not seen the Bailiff climbing over multiple jurors to communicate with Juror 341.

7

The district court concluded that there was no juror misconduct "such that 'a fair and due consideration of the case has been prevented[.']'" The court specifically found that Rodriguez's allegation that Juror 341 was "sleeping during much of the testimony" was not true. As for Rodriguez's assertion that the verdict was contrary to law or evidence, the court denied him relief on that basis because counsel failed to brief the issue.

At a later hearing, the district court sentenced Rodriguez to a fixed life sentence. Rodriguez timely appealed.

## II. STANDARDS OF REVIEW

On appeal, we review the denial of a motion for a new trial pursuant to Idaho Criminal Rule 34 under an abuse of discretion standard. *State v. Hooley*, 166 Idaho 417, 419, 460 P.3d 341, 343 (2020). Idaho Code section 19-2406 provides seven statutory grounds for granting a new trial in criminal proceedings. This case centers on the third ground, which states that a new trial may be granted "[w]hen the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented." I.C. § 19-2406(3).

"A trial court has wide discretion to grant or refuse to grant a new trial, and, on appeal, this Court will not disturb that exercise of discretion, absent a showing of manifest abuse." *State v. Cantu*, 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997). *See also State v. Strange*, 147 Idaho 686, 688, 214 P.3d 672, 674 (Ct. App. 2009). This Court applies the four-part *Lunneborg* standard when reviewing for an abuse of discretion. *Hooley*, 166 Idaho at 419, 460 P.3d at 343. An abuse of discretion does not occur where the lower court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Id.* (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

Additionally, a trial court's findings of fact are reviewed for clear error. *State v. Ish*, 166 Idaho 492, 501, 461 P.3d 774, 783 (2020); *State v. Rogers*, 144 Idaho 738, 740, 170 P.3d 881, 883 (2007). Thus, they should "not be overturned unless they are clearly erroneous." *Rogers*, 144 Idaho at 740, 170 P.3d at 883. "A factual finding is clearly erroneous only if it is not supported by substantial and competent evidence in the record." *Stuart v. State*, 127 Idaho 806, 813, 907 P.2d 783, 790 (1995) (citation and internal quotation marks omitted).

### III. ANALYSIS

Rodriguez raises only one issue on appeal: whether the district court erred in denying his motion for a new trial on the basis of juror misconduct. Rodriguez argues that Juror 341 was asleep during portions of the trial proceedings and testimony. He asserts that this entitles him to a new trial because he has (1) proved by clear and convincing evidence that the misconduct occurred and (2) shown that the misconduct reasonably could have prejudiced him. The State responds by arguing that the district court appropriately exercised its discretion in denying the motion for a new trial, and further notes that "[t]he district court did not find that Juror 341 actually slept during any part of the trial."

The Idaho Constitution provides each defendant with an "inviolate" right to a trial by jury, Idaho Const. art. I, § 7, while the Sixth Amendment to the United States Constitution protects a defendant's right to an "unimpaired jury." *Tanner v. United States*, 483 U.S. 107, 127 (1987); *State v. DeGrat*, 128 Idaho 352, 355, 913 P.2d 568, 571 (1996). This Sixth Amendment right is "protected by several aspects of the trial process," including that the jurors' suitability is examined during voir dire; the jury is observable throughout the trial by the court, counsel, and court personnel; and jurors are observable by each other. *Tanner*, 483 U.S. at 127. Thus, "[m]isconduct can . . . be reported *before a verdict is rendered*." *DeGrat*, 128 Idaho at 355, 913 P.2d at 571 (emphasis added).

When a defendant moves for a new trial based on juror misconduct, Idaho courts apply a two-part test to determine whether a defendant is entitled to a new trial. *State v. Garcia-Ongay*, 169 Idaho 1, 3, 490 P.3d 1, 5 (2021) (citing *State v. Seiber*, 117 Idaho 637, 791 P.2d 18 (Ct. App. 1989)). First, the defendant must prove by clear and convincing evidence that juror misconduct occurred. Second, if the trial court makes such a finding, it must also be convinced that the misconduct reasonably could have prejudiced the defendant. *Id.*; *Strange*, 147 Idaho at 689, 214 P.3d at 675. This test traces back to *State v. Marren*, 17 Idaho 766, 107 P. 993 (1910), where this Court "set forth its standard for reviewing a defendant's request for a new trial based upon juror misconduct." *Seiber*, 117 Idaho at 640, 791 P.2d at 21. As the *Marren* Court explained:

> To entitle a person convicted of an offense to a new trial on the ground of disqualification of a juror, the showing should be clear and conclusive, and the trial court should be clearly satisfied that the defendant has been denied the impartial trial guaranteed to him by the Constitution.

17 Idaho at 794–95, 107 P. at 1003.

While Idaho's case law on juror misconduct is limited, the standard is clear: to prevail on a motion for a new trial due to juror misconduct, the defendant must first prove by clear and convincing evidence that juror misconduct occurred. *Garcia-Ongay*, 169 Idaho at 3, 490 P.3d at 5; *Seiber*, 117 Idaho at 640, 791 P.2d at 21. This Court has not dealt directly with a sleeping juror; however, the Idaho Court of Appeals has concluded that a juror's inattentiveness, through sleep or otherwise, may constitute misconduct. *Strange*, 147 Idaho at 689, 214 P.3d at 675 (citing *State v. Bolen*, 143 Idaho 437, 440–41, 146 P.3d 703, 706–07 (Ct. App. 2006)). Federal courts have similarly held that "[a] defendant could be deprived of the Fifth Amendment right to due process or the Sixth Amendment right to an impartial jury if jurors fall asleep and are unable to fairly consider the defendant's case." *United States v. McKeighan*, 685 F.3d 956, 973 (10th Cir. 2012). *See also United States v. Barrett*, 703 F.2d 1076, 1083 n.13 (9th Cir. 1983).

Both Rodriguez and the State point this Court to the Idaho Court of Appeals' decision in *Bolen*, 143 Idaho 437, 146 P.3d 703, to compare or distinguish the facts of this case. In *Bolen*, the defendant filed a motion for a new trial ten days after the jury found him guilty of sexual abuse of a child. 143 Idaho at 438–39, 146 P.3d at 704–05. The defendant submitted three affidavits with his motion: one from himself, one from a paralegal who worked with defense counsel, and one from a friend of the defendant who attended the trial. Each affiant alleged that three different jurors were inattentive or sleeping during the trial. *Id.* at 439, 146 P.3d at 705. One affidavit stated that a juror "appeared to be dozing on and off" and "fell asleep several times," while a second juror was concentrating on drawing. *Id.* A third juror was alleged to have been inattentive and "nodding off during some portions of the trial." "[T]he presiding judge was not informed of any alleged juror inattention or sleeping during the trial," and the defense counsel "chose not to bring their observations of alleged inattentive jurors to the trial court's attention until ten days after the trial concluded . . . ." *Id.* at 441, 146 P.3d at 707. Following an evidentiary hearing on the motion, the district court concluded "that a new trial was not warranted because the defense did not timely inform the trial court of the jurors' alleged inattention when noticed during the trial," and "the affidavits did not constitute clear and convincing evidence that juror misconduct had actually occurred." *Id.* at 439, 146 P.3d at 705.

The Court of Appeals affirmed the district court's decision. *Id.* at 442, 146 P.3d at 708. It first determined that the affidavits from the defense counsel and his paralegal demonstrated that the defense team must have observed the alleged misconduct during trial proceedings but failed to

bring the issue to the court's attention until after the trial concluded. *See id.* at 440–41, 146 P.3d at 706–07. This was a crucial error. Having failed to raise the issue during trial proceedings, the defense effectively prevented the trial court from making a timely inquiry or curing the action *during the trial*. *See id.* Consequently, the defendant was not eligible for post-verdict relief. *Id.* at 440, 146 P.3d at 706. The Court of Appeals held:

> [I]f jury misconduct occurs during trial and is unknown to the defendant and defense counsel until after a guilty verdict, relief may lie pursuant to a motion for a new trial. In contrast, if the jury misconduct is known to the defendant or to defense counsel and no timely request is made of the trial court to ameliorate the same or take other curative action, a post-verdict motion for a new trial on that basis will not lie. . . . As the United States Supreme Court has noted, "[a]llegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks or months after the verdict, seriously disrupt the finality of the process."

*Id.* (second alteration in original) (quoting *Tanner*, 483 U.S. at 120).

The Court of Appeals went on to explain that the defense's course of action precluded an earlier, and more appropriate remedy that could have been provided had the allegations of juror misconduct been raised contemporaneously with the defense's observations:

> Had the trial court been informed of the jurors' alleged misconduct as set forth in their affidavits, it could have, in its discretion, conducted an inquiry of individual jurors to determine whether they were in fact inattentive and/or had been sleeping during the trial and could have made a contemporaneous record of its own observations on the matter. If a trial court concludes that juror inattention had actually occurred, and if relief is requested, the court can take remedial steps including admonishment of any inattentive juror, replacement of a juror with an alternate or, in appropriate circumstances, declaration of a mistrial.

*Id.* at 441, 146 P.3d at 707. The Court of Appeals also determined that the final affidavit—from the defendant's friend attending the trial—made "general averments" of inattentiveness that "[fell] significantly short of satisfying the threshold of clear and convincing evidence that juror misconduct occurred." *Id.*

A similar result was reached in *State v. Strange*, where the Court of Appeals addressed a motion for a new trial based on the jurors' inability to hear testimony. 147 Idaho at 687–88, 214 P.3d at 673–74. Following Strange's conviction, a juror independently wrote to the district court to express her concerns over the courtroom's acoustics—noting that she, and other jurors, "had difficulty hearing all that was said during the trial . . . ." *Id.* at 688, 214 P.3d at 674. A motion for a new trial and an evidentiary hearing on the motion soon followed. *Id.*

11

Three jurors testified, including the juror who originally wrote to the court. *Id.* All three jurors stated that they had trouble hearing during the proceedings, while another stated "he really only had issues understanding Strange's defense counsel." *Id.* "All of the jurors testified that they could hear every question asked of a witness and all of the witnesses' answers." *Id.* The juror who originally wrote the letter to the court "reaffirmed her belief that Strange was proven guilty beyond a reasonable doubt." *Id.* Additionally, witnesses noted the measures the district court had taken to remedy the issues after having been made aware of the courtroom's poor acoustics and sound system. For example, the court asked defense counsel on multiple occasions to speak louder. *Id.* at 689, 214 P.3d at 675. One juror was provided an "assistive listening device" halfway through the trial. . *Id.* at 688–89, 214 P.3d at 674–75. Then, after the close of evidence at trial, each of the jurors "upon questioning, indicated that they were able to hear the questions presented to the witnesses at trial as well as the answers." *Id.* at 689, 214 P.3d at 675. Ultimately, from these facts, the Court of Appeals concluded that Strange failed to show by clear and convincing evidence that the jurors' hearing difficulties constituted juror misconduct. Thus, there was no error by the district court in denying the motion for a new trial. *Id.*

In examining the record in this case, we conclude that the district court did not abuse its discretion in concluding that Rodriguez failed to meet his burden to establish juror misconduct through clear and convincing evidence. For example, there is much uncertainty over whether Juror 341 was actually asleep. The bailiff's testimony, the parties' declarations and affidavits, and the district court's own observations all establish that Juror 341, at unspecified times, had his head lowered and his eyes closed. However, while the bailiff originally testified that Juror 341 was "asleep," she admitted on cross-examination that she was never sure that Juror 341 was actually sleeping. As set forth above, the bailiff testified that there were no other indications that Juror 341 had "slept," such as snoring or acting startled when she contacted him to make sure he was awake.

Perhaps most telling is the district court's own observations of the juror during the proceedings, a consideration that has received approval from the U.S. Supreme Court in juror misconduct inquiries. *Tanner*, 483 U.S. at 125 ("The District Court Judge appropriately considered the fact that he had 'an unobstructed view' of the jury, and did not see any juror sleeping."). Here, the district court shared its own observations in its order denying the motion for a new trial. The district court found that Juror 341 briefly "put his head down or nod[ded] off" three times but was always promptly stirred by the bailiff who entered the jury box. The court recounted that when it

12

first observed Juror 341 "place[] his head on the table in the jury box," the court was concerned Juror 341 was experiencing the "side effects of diabetes." The court noted that it did not address the issue openly in the trial "because it was readily apparent what was happening in the courtroom . . . such that the [c]ourt did not believe anyone in the courtroom had not seen the Bailiff climbing over multiple jurors to communicate with Juror 341." This finding, based on the district court's own observations, undermines the defense's assertion that they were completely unaware of a potentially sleeping juror until after they retained an investigator after trial.

In examining the record and findings, we agree with the district court and hold that it did not abuse its discretion by concluding that a new trial was not warranted. Rodriguez's assertion that Juror 341 was "sleeping during much of the testimony" is unsupported by the record. Importantly, there is a marked difference between a "sleepy" juror and a "sleeping" juror. All accounts described Juror 341 as briefly sitting with his eyes closed and his head in his hands at varying times throughout the trial. Each time he was immediately checked on by the bailiff. Juror 341's lowered head and closed eyes for three brief moments of the trial were not clear and convincing evidence that he was asleep or inattentive, nor was it evidence of "misconduct by which a fair and due consideration of the case has been prevented." I.C. § 19-2406(3).

We also decline Rodriguez's invitation to create a new per se ruling on how to address sleeping and inattentive jurors going forward. Existing case law has already established the requisite standards and rules for such cases. The Sixth Amendment protects the defendant's right to an "unimpaired jury," and that right is protected, in part, by the observations made by the trial court, counsel, and personnel, as well as the observations of other jurors. *Tanner*, 483 U.S. at 127. As the Court of Appeals explained in *Bolen*, potential or observed misconduct is best raised before the trial court and parties to take curative action during the underlying proceedings. *See* 143 Idaho at 440, 146 P.3d at 706. "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." *Tanner*, 483 U.S. at 120.

In the context of allegations that a juror was sleeping or inattentive, trial courts are afforded great discretion in how to avoid and address the issue. *See State v. Moses*, 156 Idaho 855, 863, 332 P.3d 767, 775 (2014) (whether to hold an inquiry or take alternative actions regarding an anxious juror was within the discretion of the trial court); *Bolen*, 143 Idaho at 441, 146 P.3d at 707 (a trial court aware of alleged misconduct can, "in its discretion," conduct an inquiry of individual jurors

13

to determine if they had been sleeping); *United States v. Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1983) (A "trial judge has considerable discretion in determining whether to hold an investigative hearing on allegations of jury misconduct and in defining its nature and extent."); *State v. Hampton*, 549 N.W.2d 756, 759 (Wis. Ct. App. 1996) ("How to proceed when faced with an assertion of jury inattentiveness is determined by the trial court's informed discretion."). Thus, a trial court that observes drowsiness or inattention creeping into the jury panel may use its discretion on when and how to take action to preserve the jurors' attention. These measures may be as simple as taking a recess, inviting the jury to stand and stretch their legs for a moment, or supplying the jury with items that may assist with attentiveness, such as a snack or beverage. If the trial court is concerned that a juror is actually sleeping, it should make a record of the court's observations on the matter and conduct an inquiry of the juror, where warranted. Where relief is requested by a party, remedial measures may also be taken and lie within the discretion of the trial court. *See Bolen*, 143 Idaho at 441, 146 P.3d at 707. Importantly, if the trial court or the attorneys have concerns, a contemporaneous record of such concerns should be made by the court and counsel during the trial.

Here, as the district court determined, Rodriguez has failed in his burden to establish by clear and convincing evidence that Juror 341 was, in fact, asleep during any stage of the trial. Substantial and competent evidence supported the district court's findings. As previously noted, "absent a showing of manifest abuse," we do not disturb a trial court's discretionary decision to deny a motion for a new trial. *State v. Cantu*, 129 Idaho 673, 674, 931 P.2d 1191, 1192 (1997). Therefore, we will not find an abuse of discretion here.

While this ruling is dispositive of Rodriguez's appeal, were we to address the question of prejudice, his motion would suffer from the same infirmity: a lack of evidence. In Idaho, "[t]o establish prejudice [for alleged juror inattentiveness], a defendant must show the identity and duration of the specific testimony, argument or instructions the juror missed." *Strange*, 147 Idaho at 689, 214 P.3d at 675. Not only is the record before us silent as to what portions of the trial Juror 341 may have missed, if any, but the bailiff also testified that it was "impossible" to determine what testimony was being presented or what was happening in the proceedings each time she noticed Juror 341 lower his head. As Rodriguez similarly summarized below, "it is impossible to know how many times Juror 341 fell asleep, what parts of the testimony he missed, what additional problems of attention he was experiencing, *or, if he was asleep at all*." (Emphasis added).

14

We conclude that the district court did not abuse its discretion because Rodriguez failed to establish by clear and convincing evidence that misconduct occurred, or that prejudice resulted from it. Thus, there was no basis to award a new trial where all of the jurors were able to hear and consider fully the evidence presented at trial. Twelve jurors were qualified for service through voir dire and twelve jurors entered their deliberations with knowledge of the material facts of the case. While it is likely that each of the twelve had slightly different observations, perceptions, and recollections of the evidence presented at trial, they still reached a unanimous verdict. Rodriguez has failed to prove that Juror 341 was somehow disqualified by misconduct from sitting in judgment of the facts of this case. Thus, we affirm the order of the district court denying Rodriguez's motion for a new trial.

## IV. CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying Rodriguez's motion for a new trial.

Chief Justice BEVAN, Justices BRODY, ZAHN, and Justice Pro Tem YEE-WALLACE **CONCUR**.