# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49953

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Boise, August 2024 Term** |
| | ) | |
| **v.** | ) | **Opinion filed: December 3, 2024** |
| | ) | |
| **GERARDO RAUL CHAVEZ,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Appellant.** | ) | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Benjamin J. Cluff, District Judge.

The judgment of the district court is <u>affirmed</u>.

Nevin, Benjamin & McKay, Boise, for Appellant. Dennis Benjamin argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kenneth Jorgensen argued.

_____

MOELLER, Justice.

Gerardo Raul Chavez appeals his conviction of second-degree murder for the 2016 killing of Vason Widaman. While Chavez was in custody at the Twin Falls County jail on a probation violation, he was recorded making a series of incriminating statements to another inmate who was acting as a confidential informant on behalf of the State. The State sought to introduce those recordings in its case-in-chief at trial. Chavez moved to suppress his statements to the informant. The district court granted the motion in part and denied it in part, ultimately suppressing just a few of the recorded statements.

The jury acquitted Chavez of first-degree murder but convicted him of the lesser-included charge of second-degree murder with a firearm enhancement. The district court later sentenced Chavez to an indeterminate life sentence with a 42-year fixed term. After sentencing and entry of judgment, Chavez filed a motion for a new trial, along with a motion for permission to contact jurors to support his motion for a new trial. The court denied both motions.

1

On appeal, Chavez argues that the district court (1) erred in denying his motion to suppress, (2) abused its discretion by imposing a 42-year fixed sentence, (3) violated the Sixth and Fourteenth Amendments to the United States Constitution by considering acquitted conduct at sentencing, and (4) erred in denying the post-trial motion for permission to contact jurors. For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 7, 2016, fifteen-year-old Vason Widaman was killed in a "drive-by-type shooting," allegedly over a $700 drug debt. Chavez was arrested and charged with first-degree murder for the crime. In July of 2016, two months after the murder but prior to Chavez being charged, Chavez was jailed for a probation violation in connection with another criminal case. While held in the Twin Falls County jail on that probation violation, Chavez was cellmates with Manuel Acevedo, who was also in custody for a probation violation and three new felonies. After being housed with Chavez, Acevedo reached out to the Twin Falls County Prosecuting Attorney's Office multiple times, asserting that he had information he learned from Chavez regarding Widaman's murder. On one such occasion, Acevedo informed the State that Chavez "had confessed to murdering Widaman," and offered to wear a wire in exchange for a deal in his own case. By this point, Chavez had already been charged with first-degree murder for the killing.

Thereafter, Acevedo was interviewed twice by police about the information Chavez was telling him regarding Chavez's involvement in Widaman's murder. Acevedo "signed a proffer to the effect that [Chavez] confessed to Acevedo that [Chavez] was the person who shot Widaman." Acevedo eventually reached a plea agreement with the State. As a part of that deal, he agreed to wear a wire to record Chavez and to testify truthfully as needed at a future trial. As found by the district court, Acevedo then proceeded to wear a concealed wire over a period of six days:

> On June 27, 2017, Twin Falls Police Detective Ken Rivers and FBI Special Agent Kyle Wright met with Acevedo and provided him with a special jumpsuit containing an electronic recording device. Acevedo was instructed to not initiate any conversation with [Chavez] regarding the shooting, nor to actively question [Chavez], but to simply record when [Chavez] voluntarily began discussing the shooting. Over a period of six days, involving numerous conversations with Acevedo, [Chavez] described in detail what happened the day Widaman was killed, and actions taken by [Chavez] following the killing. During these conversations, [Chavez] consistently, repeatedly, and in detail, implicated himself in the shooting of Widaman. On July 3, 2017, the electronic recording device was returned to Detective Rivers who created an electronic record of the conversations between [Chavez] and Acevedo.

2

When the State sought to introduce evidence of these conversations, both through Acevedo's testimony and admission of the recordings themselves, Chavez moved to suppress the statements as violative of his right to counsel under the Sixth Amendment of the United States Constitution and Article I, Section 13 of the Idaho Constitution.[1] Chavez argued that because he had asserted his right to counsel long before the time of the recordings, any incriminating statements recorded by Acevedo were elicited in violation of his constitutional rights. The State broadly objected to the motion, and then identified "thirteen portions of the recordings that it intend[ed] to introduce at trial." Accordingly, the district court limited its ruling to only the portions of the conversation the State sought to admit.

Prior to analyzing the conversations, the district court found that Acevedo was explicitly instructed not to initiate any discussions with Chavez, nor to ask him any questions. Instead, Acevedo was "instructed to simply turn on the recording device whenever [Chavez]'s conversation began to turn to the shooting." Detective Rivers even took the additional step of speaking with Acevedo's attorney, "so that his instructions to Acevedo not to ask any questions would be further impressed upon Acevedo."

The district court then addressed each of the thirteen statements individually, finding that eleven of the thirteen proffered excerpts were admissible. For two of the eleven admitted statements, the district court redacted portions from each conversation. Thus, the district court excluded two statements, redacted portions of two statements, and admitted the remaining nine statements in toto.

Thereafter, the case proceeded to trial before a Twin Falls County jury. After deliberating for just over three days, the jury acquitted Chavez of first-degree murder, but convicted him of the lesser included offense of second-degree murder and a firearm enhancement under Idaho Code section 18-4003. The district court later sentenced Chavez to an indeterminate life sentence with the first 42-years fixed. He was granted credit for the time he served in custody pending trial.

After trial, and in accordance with its normal practice, the State moved to release juror contact information so that it could send jurors a questionnaire "to allow the prosecuting attorney's office to more efficiently present its cases to jurors." Finding good cause, the district court granted

---

[1] The district court noted that Chavez "did not appear [to seek suppression of] of the non-recorded statements made by [Chavez] to Acevedo *prior* to the recordings. . . ." Nevertheless, the district court addressed those statements as well, concluding that since Acevedo was not yet an agent of the government there was no violation of Chavez's constitutional rights. *Fields*, 127 Idaho at 910, 908 P.2d at 1217. Chavez does not challenge this on appeal.

3

the motion, permitting both parties access to certain information about the jurors. The district court's order specifically stated:

> A request has been filed in this case where an attorney seeks contact information concerning the jurors who rendered verdict in this case. The motion asserts the need for this contact information so counsel may inquire of those jurors concerning performance of counsel. The [c]ourt finds good cause for this motion and authorizes and directs the jury commissioner to release the phone number, address and any email address to the attorneys for both parties in this case for the sole and limited purpose of permitting counsel to contact jurors, provided however that the jury commissioner SHALL NOT release such information if juror has specifically request [sic] that this information remain confidential. Further, the [c]ourt orders that this contact information shall not be disseminated to third parties and shall be strictly retained in counsel's files.
>
> When contacting jurors, counsel are reminded of the [c]ourt's admonition to jurors that they are not required to participate in post-verdict interviews.

On June 24, 2022, the district court set a hearing with the parties to address reports that a third party had been in contact with multiple jurors from the trial. At the hearing, the district court explained that the Jury Commissioner had advised the district court that she had received a report from one of the jurors from the trial.[2] The juror disclosed that a private investigator named Stuart Robinson had gone to the juror's home to convince the juror that the prosecutor in the case had been glaring at and otherwise intimidating the jurors through his body language during trial. The juror reported that Robinson's visit made her feel "uncomfortable" and "extremely concerned that anybody would have her name and address." The district court also noted that a second juror had reported to the court an uncomfortable interaction with Robinson. This juror felt frightened and concerned by the contact, not only about safety, but also because the juror's name and contact information had been disclosed to the defense in a murder trial.

At the hearing, both the State and Chavez's trial counsel told the district court that neither of them had disclosed any juror contact information to a third party. However, attorney Dennis Benjamin, who would later substitute as counsel for Chavez, explained that Robinson was an investigator in his employ. Mr. Benjamin explained that he had retained Robinson to assist him in some investigation related to Chavez's post-sentencing matters; however, citing attorney-client privilege, he declined to further expand on the nature of the relationship. The district court

---

[2] While some of the information discussed here is contained in documents sealed at the request of the State, both parties have freely referenced such information in their respective briefs, which were not submitted under seal. Accordingly, this Court will reference such information as needed.

determined that the actions taken by Mr. Benjamin and Robinson were contrary to the district court's prior order relating to juror contact. To that end, the district court made clear that there was to be no further contact with any jurors absent a further order from the district court.

At sentencing, Chavez's argument centered on the 15-year sentence his co-defendant (who was the driver of the car during the murder) received and urged the district court to give the same sentence to Chavez. During the hearing, counsel for Chavez explained that he did not "go into details of all -- why all the -- all the factors and the like because I think there is mitigation simply because of the age and the codefendant in this matter, [in whose case the prosecuting attorney] agreed to a 15-year sentence to the person that pled guilty to second-degree murder should be 15 years." Chavez's trial counsel additionally stated that: "I think that should be what the sentencing is in Mr. Chavez's case, the same as the person that pled guilty to the second-degree."

Prior to announcing its sentence, the district court reviewed in detail the relevant sentencing factors, including those listed in Idaho Code section 19-2521. In discussing the mitigating factors set forth in section 19-2521(2), the district court highlighted subsection (b), noting:

> The second factor is whether or not you contemplated that your criminal conduct would cause or threaten harm. It's clear through the evidence that was presented at trial that you contemplated that your conduct would cause harm. The evidence demonstrated that you went looking for Vason Widaman in order to harm or kill him. And when you did find him, you pointed your loaded gun at him and discharged your weapon several times, multiple times. This was no accident. You contemplated that your actions would kill the defendant – or excuse me – would kill Mr. Widaman.

Ultimately, the district court sentenced Chavez to "a unified sentence of life, which include[d] the weapons enhancement . . . . [and incarceration] for a fixed period of time of 42 years with the indeterminate portion, a life sentence."

Following sentencing, Mr. Benjamin filed a notice of substitution of counsel. The same day, Chavez filed a motion for a new trial. A day later, Chavez filed a motion for permission to contact jurors and a motion to disqualify both the Twin Falls County Prosecuting Attorney and the Twin Falls County prosecutor's office. The district court denied the motion to disqualify and the motion for permission to contact jurors. Later, the district court denied the motion for a new trial. Thereafter, Chavez timely appealed to this Court.

## II. STANDARDS OF REVIEW

This Court ordinarily applies a bifurcated standard of review when considering an appellate challenge to a district court's decision on a suppression motion. *State v. Maahs*, 171 Idaho 738,

5

744, 525 P.3d 1131, 1137 (2023) (citing *State v. Phipps*, 166 Idaho 1, 4, 454 P.3d 1084, 1087 (2019). "When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *Phipps*, 166 Idaho at 4, 454 P.3d at 1087 (quoting *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018)). However, "where this Court has exactly the same evidence before it as was considered by the district court . . . we do not extend the usual deference to the district court's evaluation of the evidence." *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018). "Under these limited circumstances, this Court has determined that its role on appeal is to freely review the evidence and weigh the evidence in the same manner as the trial court would do." *State v. Lankford*, 162 Idaho 477, 492, 399 P.3d 804, 819 (2017). But where the district court "also heard live testimony at the motion to suppress hearing and drew on that testimony when making its factual findings," this Court applies "the usual standard of review and consider[s] whether the district court's factual findings were clearly erroneous." *Maahs*, 171 Idaho at 744, 525 P.3d at 1137. "A factual finding is clearly erroneous if it is not supported by substantial and competent evidence." *Hood v. Poorman*, 171 Idaho 176, 186, 519 P.3d 769, 789 (2022) (citation omitted).

In reviewing a sentence that has been challenged for being excessive, we apply an abuse of discretion standard. *State v. McIntosh*, 160 Idaho 1, 8, 368 P.3d 621, 628 (2016). Additionally, "[a] trial court's decision to permit post-verdict discovery of jurors is reviewed according to an abuse of discretion standard." *State v. Garcia-Ongay*, 169 Idaho 1, 3, 490 P.3d 1, 5 (2021) (citing *Hall v. State*, 151 Idaho 42, 45, 253 P.3d 716, 719 (2011)). Under the abuse of discretion standard, this Court reviews "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Villa-Guzman*, 166 Idaho 382, 384, 458 P.3d 960, 962 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

### III. ANALYSIS

On appeal, Chavez argues that the district court (A) erred in denying his motion to suppress statements allegedly obtained in violation of his right to counsel, (B) abused its discretion by imposing an indeterminate life sentence with a fixed term of 42 years, (C) violated the Sixth and Fourteenth Amendments to the U.S. Constitution by considering acquitted conduct at sentencing,

and (D) erred in denying his post-trial motion for permission to contact jurors. We will address each argument in turn.

### A. The admission of Chavez's statements to his cellmate did not violate his Sixth Amendment right to counsel.

The first issue on appeal is whether the district court erred in denying Chavez's motion to suppress the incriminating statements Chavez made to Acevedo. Chavez asserts that Acevedo, acting as an agent of the government, deliberately elicited incriminating information from Chavez without his attorney present in violation of his Sixth Amendment right to counsel. Before addressing the merits of this contention, we must determine the applicable standard of review.

   1. *Because the district court heard and considered live testimony in ruling on the motion to suppress, we will not conduct a* de novo *review and will instead review the district court's factual findings and determine whether they were clearly erroneous.*

Chavez argues that this Court should review the suppression motion *de novo*, contending that the evidence before us on appeal is the same as the evidence considered by the district court. Chavez maintains that the standard established in *State v. Andersen* should apply in this instance. 164 Idaho 309, 312, 429 P.3d 850, 853 (2018).

In *Andersen*, the district court considered a motion to suppress at a hearing where "neither party presented testimony." *Id.* Instead, "the parties stipulated to introduction of the preliminary hearing transcript and a video recording created by [the police officer] of her contact with [the defendant]." *Id.* On appeal of that motion to this Court, we noted that the case "present[ed] the unusual situation where this Court ha[d] *exactly the same evidence* before it as was considered by the district court: the transcript of the preliminary hearing and the video recording. . . ." *Id.*, at 312, 429 P.3d at 853. (Emphasis added). In those limited and unusual circumstances, we "freely review the evidence and weigh the evidence in the same manner as the trial court would do." *Id.* (quoting *Lankford*, 162 Idaho at 492, 399 P.3d at 819).

However, we later distinguished the situation presented in *Andersen* from the one in *State v. Maahs*. 171 Idaho at 744, 525 P.3d at 1137. There, in ruling on a motion to suppress, the district court not only considered the preliminary hearing transcript and the officer's body camera footage, but also "heard live testimony at the motion to suppress hearing and drew on that testimony in making [its] factual findings." *Id.* Because the evidence before this Court on appeal was not the same that was before the district court, the case did not fit within "the same unique and narrow

circumstances as *Andersen*." *Id.* Thus, we applied "the usual standard of review and consider[ed] whether the district court's factual findings were clearly erroneous." *Id.*

In this case, the district court considered the audio recordings and the transcripts of the conversations between Chavez and Acevedo, both of which are before this Court on appeal. However, both Chavez and Detective Rivers testified at the hearing on the motion to suppress, and the district court relied, at least in part, on that testimony in making its factual findings.[3] Thus, because the district court considered both the weight and credibility of live witness testimony in making its factual findings, the situation is equivalent to the one in *Maahs*, where the evidence before this Court is not identical to the evidence before the district court. For this reason, we apply the usual standard of review and consider whether the district court's factual findings were clearly erroneous.

2. *The district court did not err in determining that the admitted portions of Chavez's incriminating statements were not deliberately elicited.*

The Supreme Court of the United States has consistently held that "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (first citing *United States v. Wade*, 388 U.S. 218, 227–228 (1967); and then citing *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). Importantly, "[i]nterrogation by the State is such a stage." *Id.* (first citing *Massiah v. United States*, 377 U.S. 201, 204–205 (1964); and then citing *United States v. Henry*, 447 U.S. 264, 274 (1980)). The United States Supreme Court has further explained that "an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . *deliberately elicited* from him after he had been indicted and in the absence of his counsel.' " *Fellers v. United States*, 540 U.S. 519, 523 (2004) (emphasis added) (alteration in original) (quoting *Massiah,* 377 U.S. at 206) (other citations omitted).

This Court has recognized this protection in the context of both the United States Constitution and the Idaho Constitution: "The Sixth Amendment to the United States Constitution

---

[3] For example, the district court noted in its memorandum decision and order on the motion to suppress that "[Chavez] testified at the hearing of this matter that the recorded conversations did not include everything that he and Acevedo spoke about. [Chavez] further testified that Acevedo asked him questions about his case." The district court then noted that it "had the opportunity to observe [Chavez] while on the witness stand, and the [c]ourt affords very little weight to [Chavez]'s testimony in this regard." The district court also made clear that Chavez "presented no testimony as to what specific questions were asked by Acevedo, what specific answers were given, and whether any of the questions or answers were incriminating in nature."

and Article I, Section 13 of the Idaho Constitution clearly bar admission of statements *deliberately elicited* by governmental agents from an incarcerated defendant who is represented by counsel." *State v. Fields*, 127 Idaho 904, 910, 908 P.2d 1211, 1217 (1995) (emphasis added) (first citing *Henry*, 447 U.S. at 270; then citing *Massiah*, 377 U.S. at 206; and then citing *State v. Fain*, 116 Idaho 82, 85, 774 P.2d 252, 255, *cert. denied,* 493 U.S. 917 (1989)).

In the context of inmate informants, "this prohibition does not require that testimony be excluded where inmate informants have not made any affirmative effort to elicit statements from the defendant or initiated conversations about the alleged crime." *Fields*, 127 Idaho at 910, 908 P.2d at 1217. Instead, "[i]n order to establish that he was subjected to an unconstitutional interrogation, [the defendant] must 'demonstrate that the police and their informants took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.' " *Fields*, 127 Idaho at 910, 908 P.2d at 1217 (quoting *Fain*, 116 Idaho at 85, 774 P.2d at 255). Thus, in *Fields*, this Court articulated the two-part test for evaluating an alleged Sixth Amendment violation of this nature: "The inquiry . . . requires that this Court determine whether (1) the inmates were acting as agents of the police, and (2) the informants affirmatively and deliberately elicited the incriminating statements." *Id.* (citing *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991)).

Acevedo was not acting as an agent of the government when he initially contacted law enforcement and informed them that Chavez had made incriminating statements regarding the killing of Vason Widaman. However, it is undisputed that Acevedo was acting as an agent of the government when he recorded Chavez making additional incriminating statements. Thus, the only question is whether Acevedo "deliberately elicited" the incriminating statements from Chavez that are contained in the State's recordings.

In *Kuhlmann v. Wilson*, the United States Supreme Court analyzed what it means to deliberately elicit incriminating statements from a defendant. 477 U.S. 436 (1986). Discussing *Massiah* and the subsequent cases in its wake, the Supreme Court noted that the *Massiah* test was adopted "to protect accused persons from indirect and surreptitious interrogations as well as those conducted in the jailhouse." *Id.* at 457 (citation omitted). "Thus, the Court made clear that it was concerned with interrogation or investigative techniques that were equivalent to interrogation . . . ." *Id.* Further, because the Sixth Amendment is not violated when the State obtains incriminating statements from the defendant by luck or happenstance, "a defendant does not make

9

out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." *Id.* at 459.

In determining whether the recorded statements made by Chavez to Acevedo were deliberately elicited, the district court reviewed the transcript of their conversations, listened to the actual audio recordings of the conversations, and heard the live testimony of Chavez and Detective Rivers regarding the conversations. The district court individually addressed each of the thirteen portions of the conversations the State sought to admit, referring to each portion in order (such as "Acevedo 1" for the first, "Acevedo 2" for the second, and so on; for ease of reference, this Court will do the same) and ruled on each as follows.

As for Acevedo 1, the district court admitted a portion of the conversation containing a long, uninterrupted monologue by Chavez. The conversation started out as an unremarkable discussion of each other's legal woes, with both Chavez and Acevedo lamenting their current situations. As the conversation went on, Chavez began to provide more detail about his situation and involvement in Widaman's murder. During Chavez's long monologue, Acevedo did ask questions of Chavez, but they were general, conversational questions such as: "You alright, man?" and "What do you mean?" Acevedo also made general statements such as "Uh huh," and "Yeah," as Chavez shared his story, as if to let Chavez know he was still listening and following him. Eventually, Chavez launched into a lengthy discussion of his mental state in relation to the murder, stating he "never had nightmares about it" and felt that "everything [he] did was justified to a certain level." He also relayed that he felt pressure from his co-defendant in the moment of the shooting, and ending by stating "that's when everything went fucking wrong. You know what's fucked up, though?"

The district court, in applying the relevant standard, found the initial statements and questions from Acevedo (such as "You alright man?" and "What do you mean?") as being "clearly general in nature and not interrogating questions seeking incriminating statements." The district court then found that Chavez's monologue was "not the product of any deliberate elicitation by Acevedo. Indeed, Acevedo did not even speak for several minutes before [Chavez] made these statements." Accordingly, the district court denied the motion to suppress Acevedo 1.

The same conversation from above continued in Acevedo 2. After Acevedo responded to the question at the end of Chavez's first monologue by simply stating, "No," Chavez launched into another lengthy monologue, describing his behavior immediately following the murder. Chavez

described the location of the murder, the location of a witness at the scene, and expressed doubt and frustration about a witness's account of the murder. The district court admitted the statements, finding that they "were not the result of Acevedo affirmatively and deliberately eliciting incriminating statements from [Chavez]." However, the district court suppressed the final two lines of Acevedo 2, where Acevedo asked Chavez a specific question about the location of a witness to the shooting that he described in his preceding monologue. Acevedo asked, "Dang, okay, so… she was where?" The district court found that the question deliberately elicited an incriminating statement from Chavez; therefore, it suppressed the question and accompanying answer.

In Acevedo 3, the conversation turned to the topic of orange juice. After Acevedo asserted that he thought oranges tasted "like clay," Chavez responded in the following manner: "Oranges taste nasty. I don't like them. Damn, I don't like talking about it, but it all happened so quick. I should have got out and beat the kid up, you know what I mean?" The district court admitted this statement, again finding it to be a spontaneous comment that was not deliberately elicited by Acevedo's comment about oranges. However, Acevedo subsequently responded to the statement about "beating up a kid" with a question by asking, "Who?" and Chavez responded by saying, "The kid that was shot," and "I should have got out and beat him up. I'd way rather take an aggravated assault than this charge, you know what I mean? Fuck." The district court suppressed the question by Acevedo and the answer by Chavez, finding that because the "clarification sought further incriminating information from [Chavez]," it was a deliberate elicitation of incriminating information.

The same themes and structure of the conversations continue throughout each excerpt. Acevedo 4 consists of multiple unsolicited, lengthy monologues from Chavez, detailing the circumstances leading up to the murder, focusing on events from several months beforehand. The district court noted that throughout the day that Chavez made the statements in Acevedo 4, he "would randomly begin speaking about his involvement in the crime. This [was] true even when other subjects were being discussed by the parties." The district court provided specific examples: "For example, prior to the statements made in Acevedo 4, [Chavez] was discussing the amount of money to be made by apparently dealing drugs. [Chavez] then unexpectedly changes the direction of his comments." Therefore, the district court concluded that the "statements made in Acevedo 4 clearly resulted from [Chavez] spontaneously launching into a monologue about how he 'didn't want to do it.' "

11

At one point in Acevedo 4, Chavez referenced the murder victim's name, "Vason." However, Acevedo misheard Chavez, thinking he said "Mason," the name of Acevedo's son. Acevedo asked, "What was his name?" When Chavez replied with, "Vason," Acevedo followed up by asking, "With a V?" to which Chavez responded in the affirmative. The district court found that Acevedo simply misheard Chavez and was seeking clarification due to confusion with his son's name, and was not deliberately eliciting incriminating information. Accordingly, the district court denied the motion to suppress as to Acevedo 4.

Acevedo 5 and 6 were excerpts from the same dialogue as Acevedo 4. The conversation continued as follows:

Acevedo: Where my socks at?

Chavez: What?

Acevedo: Not that one.

Chavez: I have your socks.

Acevedo: Oh, then what happened?

Chavez: I have your socks. Lift the head up. There should be a pair of socks in there, I think. They are clean. Anyways, and so about four months down the road after all this shit happened, like, what the hell? Fold them back up (the socks). Anyways . . . .

Chavez then went on to describe the situation between him and Widaman four months before the murder, tracking the events up to the point where he "smoked his ass." This monologue was very lengthy, uninterrupted by Acevedo, except for the occasional, "Yeah," to let Chavez know he was still listening. The district court found the statements were not the result of deliberate elicitation, explaining:

In addressing the portions of the recorded conversations titled Acevedo 5 and 6, which are excerpts of the same monologue by Defendant, the [district court] finds that Defendant's statements were not the result of Acevedo affirmatively and deliberately eliciting incriminating statements from Defendant. As with the other parts of the recording, the [c]ourt listened to the actual dialogue between the two cellmates. Following Defendant's statements in Acevedo 4, there is a clear break in Defendant's monologue while Acevedo is attempting to locate his socks. After some discussion about Acevedo's socks and what may have happened to them, Defendant launches into another lengthy and uninterrupted monologue regarding his interactions with, and the killing of, Widaman. At certain points in the recording, Defendant pauses to ask if Acevedo understands what Defendant is saying, to which Acevedo responds simply "yeah," with no encouragement to

12

continue. Accordingly, the [c]ourt denies Defendant's Motion to Suppress as it relates to Defendant's statements as set forth in Acevedo 5 and 6.

In Acevedo 7, Chavez went on to relate in detail the events that occurred after the shooting, discussing how he attended a party at his house later that night. Acevedo occasionally chimed in with comments such as, "Yeah. You told me about that," or just "Yeah." Following a discussion of the rap music scene in Twin Falls, Chavez stated:

> I still don't feel bad about it. I mean after I did it, I never felt bad about it. I don't feel like, 'Oh hell yeah, I just smoked that kid' you know what I mean? I don't feel like that either, but, I hate myself for a lot of other reasons though. Cause this, this is what I wanted, dawg. This is what I wanted. I wanted everyone to know my name. I wanted to be that one dude that nobody would fuck with, know what I mean? Nobody stole from me.

The district court found that the statements in Acevedo 7 were simply the result of Chavez "spontaneously stating that he did not feel bad about it (presumably killing Widaman)." The district court found that the statement was spontaneous because it "was completely off the topic of partying and rappers that was being discussed by [Chavez] and Acevedo at the time."

The district court similarly found the statements in Acevedo 8 to be spontaneous. In Acevedo 8, Chavez was again loquacious as he shared his insights about the murder. The conversation was one-sided, with Acevedo intermittently responding by stating, "Uh huh," and "Yeah." At the end of the conversation, Chavez stated: "I shouldn't have given a fuck what they thought. I should have done me and just… stuck to my gut feeling and got out and pistol whipped that little bitch. You know what I mean?" The district court concluded that these statements from Chavez were "clearly wholly spontaneous," and Acevedo "did nothing to provoke [Chavez]'s statements." Thus, the district court found that the statements in Acevedo 8 were not deliberately elicited by Acevedo.

In Acevedo 9, the district court noted that it could not discern what Acevedo said to Chavez, finding it "unintelligible." Because it could not determine whether the statements sought to deliberately elicit incriminating information from Chavez, the district court found that Chavez had not "borne his burden of demonstrating that [Chavez's] subsequent statements were deliberately elicited by Acevedo."

The district court also denied the motion to suppress Acevedo 10, finding that Chavez "launch[ed] into an unsolicited monologue regarding his feelings about the killing." Acevedo made statements such as, "Huh?" and "What?" and "Yeah" and "Uh huh" throughout the exchange. At

13

one point, Chavez asked Acevedo about his view on his own criminal conduct, to which Acevedo responded. The district court found that "Acevedo's responsive comments do not appear to be designed to provoke further incriminating statements by [Chavez]; rather, such statements were simply engaging in the conversation that clearly [Chavez] wished to have." Accordingly, the district court found that Chavez's statements were not deliberately elicited and denied the suppression of the statements.

In Acevedo 11, Chavez again freely discussed his feelings about the murder. At one point in the conversation, the following exchange occurred:

> Chavez: I was thinking this is where shit gets real, dawg. This is where my life is going to change forever or I'm going to fucking - you know what I mean? I'm going to punk out and fucking, I feel like I would be a punk if I didn't do it. You know what I mean? I don't know why. But I feel like I wouldn't be me if I didn't do it, you know what I mean?
>
> Acevedo: Huh?
>
> Chavez: That is just how I feel.
>
> Acevedo: That you wouldn't be you if you, that you did it?
>
> Chavez: If I didn't do it.
>
> Acevedo: If you didn't do it. Oh, Christ.

The district court again found that Chavez's statements resulted from Chavez "spontaneously discussing the killing of Widaman," and "were clearly not the result of any deliberate elicitation by Acevedo."

Finally, the district court agreed with the defense and found that Acevedo 12 and Acevedo 13 "were the result of Acevedo affirmatively and deliberately eliciting incriminating statements from [Chavez]." The district court explained that: "Although the discussion between Defendant and Acevedo is lengthy, and it is clear that Defendant independently desired to talk extensively about the murder, the [district court was] unable to determine where the conversation would have ended had Acevedo not questioned [Chavez]." Accordingly, the district court granted the motion and suppressed Acevedo 12 and 13.

On appeal to this Court, Chavez argues that Acevedo "took action, beyond merely listening, that was deliberately designed to elicit incriminating remarks from Mr. Chavez." In Chavez's view, "[i]n every one of the admitted clips, Mr. Acevedo was engaging Mr. Chavez in conversation and was not merely a passive listening post. This alone was enough to constitute deliberate elicitation of the statements, rendering them inadmissible." Chavez asserts that Acevedo

14

was an active participant in conversation and encouraged Chavez to make the incriminating statements, thereby deliberately eliciting incriminating statements.

Chavez cites *Kuhlmann*, which recognized the notion of an informant acting as a mere "listening post" and, thus, not deliberately eliciting incriminating information from a defendant. *Kuhlmann*, 477 U.S. at 456, n.19. Contrasting that idea to the present case, Chavez argues that by engaging in general conversation and making passive comments to Chavez, Acevedo was not simply acting as a "listening post." In making such an assertion, Chavez argues for an expansive reading of the *Massiah* line of cases, positing that *any* affirmative action taken by the informant is an improper deliberate elicitation.

While it is true that *Kuhlmann* suggests that an informant may permissibly act as a mere "listening post," it does not go so far as to require the informant to remain totally silent. To hold that a cellmate informant must literally remain silent—refusing to engage in standard conversational norms by making ordinary expressions intended to convey that the listener is following the speaker[4]—would be contrary to the practical application of *Massiah* and misapprehend the purpose of the Sixth Amendment's protections. This is underscored by *Kuhlmann*'s important reminder that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are *the equivalent of direct police interrogation*." *Id.* at 459 (Emphasis added). A cellmate informant making passive and general statements that maintain a normal conversation, on its own, does not rise to the level of direct interrogation or its equivalent. *See United States v. Lentz,* 524 F.3d 501, 521–22 (4th Cir. 2008) (finding no deliberate elicitation where a jailhouse informant was instructed to, and engaged in, personalized conversations to bring up matters of common interest, but did not directly elicit incriminating information); *Sincock v. State*, 76 P.3d 323, 333 (Wyo. 2003) (finding that there is no Sixth Amendment violation in the context of a jailhouse informant "if the incriminating statements made by the defendant to the informant are voluntary."); *People v. Williams,* 940 P.2d 710, 744 (Cal.1997) (holding that incriminating statements were not deliberately elicited even

---

[4] In linguistics, this is known as "backchanneling" and refers to statements made "to show that you are listening to someone who is talking to you, by making a sound or sign," such as "OK," "Uh huh," "I see," or "yeah." https://dictionary.cambridge.org/us/dictionary/english/backchannel (last visited September 6, 2024). Backchanneling implies two channels of communication in a conversation, with the "main channel" used by the primary speaker, and the secondary "backchannel" used by the listener. See Sheida White, *Backchannels across cultures: A study of Americans and Japanese*, Language in Society 18, 59-76 (1989). By backchanneling, a person assumes the role of the primary listener in the conversation.

15

when the informant and defendant engaged in conversations about each other's cases, as the informant did not actively question the defendant about the details of his case); *State v. Swinton,* 847 A.2d 921, 966 (Conn. 2004) (scrutinizing the record to determine whether the exchanges between the defendant and the jailhouse informant "look like government interrogations."); *United States v. Stevens,* 83 F.3d 60, 64 (2d Cir. 1996) (stating that the right to counsel is not violated when a defendant voluntarily admits a crime to an informant without any urging from the informant, as that situation does not look like a government interrogation).

In analyzing each of Chavez's incriminating statements, the district court applied the correct standard, seeking to determine whether the statements were deliberately elicited by Acevedo. The district court relied on the transcript, the audio of the conversations, and the testimony of Chavez and Detective Rivers from the suppression hearing. In each instance where it denied the suppression of particular statements, the district court concluded that Acevedo's comments and actions did not rise to elicitation of incriminating statements because they were not the equivalent of police interrogation. On appeal, Chavez has not established that any of the district court's findings were clearly erroneous.

Chavez points to instances where Acevedo "encouraged further statements" from Chavez by making statements such as "Yeah," or asking questions such as, "What do you mean?" But as stated above, merely being a participant in a conversation, or asking a clarifying question when the agent has misheard the defendant, does not automatically amount to an elicitation equivalent to direct police interrogation—the defendant must show something more. An informant may respond to a defendant's voluntary oration with comments that merely maintain a conversation without transforming a conversation into a de facto interrogation. *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 880 (3d Cir. 1999) (finding that the informant asking clarifying questions in direct response to the defendant's voluntary statements did not alter the fundamental nature of the conversation, and thus was not a Sixth Amendment violation); *United States v. Jacques*, 684 F.3d 324 (2d Cir. 2012) (finding that when an informant asked clarifying questions about the defendant's role in a plan to tamper with a witness, it did not rise to the level of a Sixth Amendment violation). Likewise, Acevedo making passive comments and asking simple clarifying questions, such as "Yeah," and "What do you mean?" did not change the fundamental and overarching nature of the conversations at hand—Chavez voluntarily and repeatedly incriminating himself to his cellmate through a series of long, uninterrupted monologs. The district

16

court recognized this fact and consistently made clear that it found Acevedo's comments in the admitted portions of the excerpts to be general, passive, and not designed to deliberately elicit incriminating statements.[5]

Though the exact test established in *Massiah* and its progeny is less than crystal clear, the underlying core guidance is nonetheless discernable. The determination of whether a defendant was subjected to an impermissible interrogation will undoubtedly vary from case-to-case based on the totality of the circumstances present. In this instance, we conclude that the district court properly concluded that Acevedo did not deliberately elicit information from Chavez in a manner forbidden under *Kuhlmann;* thus, we find no error in the district court's admission of the statements.

### B. The district court did not abuse its discretion in imposing a life sentence with the first 42 years determinate.

As noted, after Chavez was found guilty of second-degree murder, the district court imposed a sentence of life with 42 years determinate, which Chavez argues on appeal is excessive. Notably, Chavez is appealing only the fixed portion of his sentence.[6]

Challenges to a sentence are reviewed under an abuse of discretion standard. *McIntosh*, 160 Idaho at 8, 368 P.3d at 628 ("When evaluating whether a sentence is excessive, this Court considers the entire length of the sentence under an abuse of discretion standard." (citing *State v. Stevens*, 146 Idaho 139, 148, 191 P.3d 217, 226 (2008)). As this Court has explained, a "sentence fixed within the limits prescribed by the statute will ordinarily not be considered an abuse of discretion by the trial court." *State v. Anderson*, 172 Idaho 133, 530 P.3d 680, 690 (2023) (quoting *McIntosh*, 160 Idaho at 8, 368 P.3d at 628). "To show an abuse of discretion, the defendant must show that in light of the governing criteria, the sentence was excessive, considering any view of the facts." *McIntosh*, 160 Idaho at 8, 368 P.3d at 628 (citation omitted). "The governing criteria are: '(1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrongdoing.' " *Anderson*, 172 Idaho at__, 530 P.3d at 690 (quoting *McIntosh*, 160 Idaho at 8, 368 P.3d at 628); *see also State v.*

---

[5] Acevedo additionally testified at trial about similar remarks Chavez made to him before he was equipped with a recording device.

[6] This Court has previously ruled that an indeterminate life sentence following a conviction for second-degree murder is not excessive. *State v. Kaiser*, 108 Idaho 17, 18, 696 P.2d 868, 869 (1985) ("The Court of Appeals ruled that the indeterminate life sentence for second degree murder was not excessive. We agree with this decision of the Court of Appeals and affirm the holding that the indeterminate life sentence was not excessive.").

*Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). Further, "[t]his Court will set aside the sentence only where reasonable minds could not differ as to the excessiveness of the sentence." *Id.* (quoting *State v. Farwell*, 144 Idaho 732, 736, 170 P.3d 397, 401 (2007)).

Here, the relevant statutory sentencing range is found in Idaho Code section 18-4004, which states: "Every person guilty of murder of the second degree is punishable by imprisonment not less than ten (10) years and the imprisonment may extend to life." I.C. § 18-4004. Chavez's sentence also included a statutory enhancement under Idaho Code section 19-2520, which provides that a defendant who uses a firearm during the commission of certain felonies "shall be sentenced to an extended term of imprisonment," which is calculated by "increasing the maximum prison sentence authorized for the crime" by fifteen years. Chavez's 42-year fixed sentence falls squarely within the limits prescribed by the effect of both statutes. Therefore, in order to establish that the district court abused its discretion by sentencing him within the statutory range, Chavez must demonstrate that, "considering any view of the facts," reasonable minds "could not differ as to the excessiveness of his sentence." *Anderson*, 172 Idaho at__, 530 P.3d at 690.

Chavez argues that his punishment "is unreasonable because it far exceeds the sentence needed to meet the purposes of sentencing." The predominant basis for this argument is that Chavez was young (19 years old at the time of the murder and 24 years old at the time of sentencing) and that a lesser punishment would sufficiently meet the objectives of criminal punishment. Additionally, he points to the 15-year sentence given to his co-defendant (the driver of the car during the shooting), arguing that his 42-year fixed term is disproportionate and that he should receive a similar punishment.

On appeal, Chavez addresses each of the four governing *Toohill* factors in an attempt to show that his sentence was excessive. 103 Idaho at 568, 650 P.2d at 710. First, Chavez argues that a shorter fixed sentence would sufficiently serve to protect society, as he will "age out of [his] criminal behavior" well before the end of the imposed 42-year fixed sentence.[7] Second, Chavez asserts that the lengthy sentence will have no specific deterrent effect on him as it will "encourage [him] to engage in criminal conduct in prison." Likewise, he argues that the "extraordinary amount of confinement will not create any additional general deterrent effect," as compared to a lesser sentence. Third, Chavez contends that his youth gives rise to the possibility of rehabilitation.

---

[7] To this end, Chavez summarily references a chart utilizing FBI and U.S. Census Bureau data purporting to show that arrest rates for violent males decrease after they reach the age of 24.

Finally, Chavez simply asserts that "[a] life sentence with twenty years fixed is sufficient for both punishment and retribution."

At sentencing, the district court carefully addressed the relevant sentencing factors, standards, and arguments. It then applied these factors, explaining how each factor did, or did not, apply to the facts of the case. The district court ultimately concluded that while all the aggravating factors enumerated in Idaho Code section 19-2521 were present, none of the mitigating factors applied to Chavez. In addressing each one, the court first observed that the harm caused by Chavez's conduct was the ultimate one—taking the life of another person. The court noted that Chavez must have contemplated that his actions would cause harm or death when he "went looking for [Widaman] in order to harm or kill him." It found that there was no "excuse" or "justification" for Chavez's behavior, explaining that killing a child over a $700 drug debt was simply indefensible conduct. It found that his actions were not induced by the victim, as Widaman was simply riding his bike home at the time of the murder. It found that the harm to the victim was not compensable, because nothing could restore the victim's life or return him to his family. Next, the court noted Chavez's ongoing criminal activity and delinquency while incarcerated, evidenced by thirty-seven disciplinary actions during his time in jail. It determined that Chavez's criminal conduct, murder over a small drug debt, was a result of circumstances likely to reoccur due to Chavez's willingness to perpetrate violence over such a small amount of money simply because he felt disrespected. The court observed that Chavez had shown no remorse and that he continued to display unlawful and disobedient behavior in jail. Finally, the court noted that Chavez had not demonstrated any amenability to treatment.

The district court then analyzed the aggravating factors, finding that all were applicable to Chavez and that each indicated that a long sentence of imprisonment was appropriate. The district court found that there would be an undue risk that Chavez would commit another crime if released, noting that Chavez himself stated his intention to try to kill the investigating officer in the case if released. The district court found that any sentence that did not include a significant amount of imprisonment would depreciate the severity of the crime, noting that the manner in which Chavez killed Widaman was both brutal and appalling. The district court then found that imprisonment of Chavez would be the most appropriate punishment that it could impose, and would serve to deter both Chavez himself and others in the community.

Considering the district court's findings and the totality of the record on appeal, Chavez has failed to demonstrate that his sentence was unreasonable under any view of the facts. Instead, Chavez merely asserts that a lesser sentence would have been sufficient, mostly due to his youth and the lesser sentence imposed on his co-defendant. This argument is unavailing. There was no abuse of discretion by the district court in concluding, based on the unique circumstances of this case, that there was a marked difference in criminal culpability between the person who shot and killed the victim and the person who drove the car. While the behavior of both the shooter and the driver was reprehensible, the district court acted reasonably and within the parameters of its discretion by considering their respective culpabilities and imposing a much stiffer sentence for the shooter. Although this Court recognizes that Chavez's sentence is a heavy one, even if a lesser punishment would have been appropriate, that is not the standard we apply in reviewing a sentence on appeal. In this case, the district court considered the relevant sentencing factors, stating explicitly on the record how each mitigating factor did not apply and how each aggravating factor did indeed apply. The district court did so with clarity and attention to detail. Through an exercise of reason, the district court reached its decision to sentence Chavez to a sentence of life with 42-years determinate. Chavez has failed to establish that his sentence was excessive under any view of the facts. Thus, we conclude that the district court did not err in sentencing Chavez.

## C. The district court did not violate either the Sixth or Fourteenth Amendments by considering acquitted behavior at Chavez's sentencing.

As stated above: "Sentencing decisions are reviewed under the abuse of discretion standard." *State v. Barr*, 166 Idaho 783, 785, 463 P.3d 1286, 1288 (2020), *as amended* (June 25, 2020) (citing *McIntosh*, 160 Idaho at 8, 368 P.3d at 628). Further, "[t]his Court will not overturn a district court's factual findings regarding aggravating and mitigating factors unless those decisions are clearly erroneous." *State v. Haws*, 167 Idaho 471, 480, 472 P.3d 576, 585 (2020), *as amended* (Oct. 2, 2020) (citing *State v. Bodenbach*, 165 Idaho 577, 592, 448 P.3d 1005, 1020 (2019)).

Chavez assigns error to the district court's consideration of factor (b) of Idaho Code section 19-2521(2). That section states that if "[t]he defendant did not contemplate that his criminal conduct would cause or threaten harm[,]" it shall weigh in favor of avoiding a sentence of imprisonment. I.C. § 19-2521(2)(b). Chavez argues that because he was acquitted of first-degree murder (an element of which is premeditation), the district court erred in considering this factor because it "used evidence of premeditation when sentencing him." Chavez does not contest the

veracity of the evidence considered, but instead maintains that the district court should not have considered premeditation at all.

In addressing that factor, the district court explained:

> The second factor is whether or not you *contemplated* that your criminal conduct *would cause or threaten harm*. It's clear through the evidence that was presented at trial that you contemplated that your conduct would cause harm. The evidence demonstrated that you went looking for Vason Widaman in order to harm or kill him. And when you did find him, you pointed your loaded gun at him and discharged your weapon several times, multiple times. *This was no accident. You contemplated that your actions would kill* the defendant – or excuse me – would kill Mr. Widaman.

(Emphasis added). Chavez asserts that these comments demonstrate that the district court unconstitutionally considered evidence of premeditation during sentencing. Chavez maintains that when a court, during sentencing, considers conduct for which the defendant has been acquitted by a jury, it undermines his right to a jury trial and his right to due process.

Chavez's argument is unavailing for two reasons. First, it is not at all clear that the district court actually determined that Chavez "premeditated" the crime. Indeed, the district court found that Chavez "went looking for Vason Widaman in order to harm *or* kill him." (Emphasis added). This determination is consistent with evidence presented at trial and with the verdict reached by the jury. As the State observes in its brief, the "[e]vidence at trial indicated that Chavez had not decided whether he was going to pistol whip [Widaman] or shoot him until the moment of confrontation, and even then only decided to shoot [Widaman] when he tried to get away." While the jury found that Chavez did not premeditate the murder, it found that Chavez had committed the murder with malice aforethought. I.C. §§ 18-4001, 4003(g); Idaho Criminal Jury Instruction No. 705. Thus, the district court's finding that Chavez *contemplated* that his conduct would cause death *or* harm is not the same as finding that the murder was premeditated.

Second, and more importantly, even if the district court found the murder to have been premeditated, it did not commit error in considering that information at sentencing. When sentencing a defendant, a district court may consider "the defendant's prior conduct for which he was tried and acquitted." *State v. Flowers*, 150 Idaho 568, 574, 249 P.3d 367, 373 (2011) (first citing *Witte v. United States*, 515 U.S. 389, 397 (1995); and then citing *United States v. Watts*, 519 U.S. 148, 156 (1997) (stating that "a district court may properly consider 'evidence adduced in a trial that resulted in an acquittal' when choosing a particular sentence within a guideline range." (citation omitted))); *see also State v. Ogden*, 171 Idaho 258, 275–76, 519 P.3d 1198, 1215–16

21

(2022). While Chavez acknowledges the directly applicable precedent from *Flowers* and *Ogden*, he asks this Court to reconsider and overrule the holdings in those cases. We decline to do so.

We conclude that the district court properly applied the statutory factors at sentencing. One of those factors specifically required the court to consider whether Chavez contemplated that the consequences of his actions—searching for the victim with the intent to either beat him or kill him, and ultimately shooting the victim multiple times—might cause harm. We find no constitutional violation or abuse of discretion in the district court's conclusion that the evidence supporting Chavez's conviction for second degree murder shows that he contemplated that his actions would cause harm. Finding no error, we affirm the district court

## D. The district court did not abuse its discretion in denying Chavez's motion for permission to contact jurors.

In *Hall v. State*, we explained the appropriate test to apply when ruling on a motion for permission to contact jurors is whether "good cause exists, suggesting that juror misconduct occurred." 151 Idaho 42, 50, 253 P.3d 716, 724 (2011). *See State v. Garcia-Ongay*, 169 Idaho 1, 3, 490 P.3d 1, 5 (2021) ("We hold that the good cause test from *Hall* is the appropriate standard to apply in ruling upon motions such as the motion being appealed in this case[,] [a request to interview jurors.]"). As this Court has previously explained, "[a] trial court's decision to permit post-verdict discovery of jurors is reviewed according to an abuse of discretion standard." *Garcia-Ongay*, 169 Idaho at 3, 490 P.3d at 5 (citing *Hall*, 151 Idaho at 45, 253 P.3d at 719).

The basis of Chavez's motion for permission to contact the jurors was "to investigate allegations that the lead prosecutor in the case and the members of the prosecution team stood in view of the jurors with their arms folded and stared at the jurors in an intimidating manner as the jurors left after ending the day's deliberations." To show good cause, Chavez submitted copies of audio interviews of two separate jury members from the trial, conducted by Robinson (the private investigator hired by Chavez's counsel).[8] Chavez also submitted affidavits in support of the motion from various people, including Chavez's mother, father, and brother.[9]

The affidavits from Chavez's family members all relayed similar accounts of the lead prosecutor's behavior on one occasion, stating that he "had his arms crossed and was staring at the

---

[8] Notably, the district court found the interviews to be inadmissible, as the statements therein were not made under oath. However, for the sake of judicial economy, the district court considered them nonetheless in an alternative ruling, and ultimately reached the same conclusion as in its initial ruling.

[9] Chavez also submitted an affidavit from Mr. Benjamin; however, the district court found the affidavit to constitute "rank hearsay," and thus did not consider it in making its ruling. Chavez does not challenge that decision on appeal.

jurors with an angry look." It was the personal impression of each family member "that the prosecutor was trying to tell the jurors that he was mad and disappointed in them for not reaching a verdict." With respect to the evidence contained in the juror interviews taken by Robinson, Chavez pointed to statements made during the interview by each juror indicating that the lead prosecutor glared at the jury once, and had his arms crossed in a "little bit of an intimidating" way. All things considered, the evidence presented by Chavez amounted to the same basic revelation: that at one point, the lead prosecutor had frowned or glared at the jury as they exited the courtroom, while the jury was still deliberating.

In opposition of the motion, the State submitted the affidavits of six bailiffs and security personnel, the Twin Falls County jury commissioner, the trial court administrator for the Fifth District, and the lead detective for the State in the case. Each affiant rebutted the claim that the lead prosecutor or the prosecuting team had engaged in intimidating behavior or ever attempted to contact the jury, and noted that no juror had commented or complained about any prosecutors' behavior.

In considering the motion, the district court correctly recognized this Court's recent decision in *Garcia-Ongay*, specifically noting that the good cause standard applied to the motion before it. *See Garcia-Ongay*, 169 Idaho at 3, 490 P.3d at 5 (holding that the good cause test is the correct standard to apply in ruling on motions requesting to interview jurors). The district court then turned to the evidence submitted in support and in opposition of the motion. The district court completed an extensive review of all the submitted evidence, addressing each item. The district court concluded that "[i]n evaluating the evidence advanced by [Chavez], even when completely ignoring the affidavit testimony submitted by the State, the [district court] concludes that [Chavez] has not submitted any good cause for the [district court] to grant its motion for a post-verdict juror investigation." Importantly, the district court observed that:

> [Chavez had] not submitted any evidence that [the lead prosecutor] contacted any juror in any manner; that [the lead prosecutor] spoke to any juror; that [the lead prosecutor] attempted to speak with any juror; that [the lead prosecutor] made any physical movements toward the jurors (apart from using the same sidewalk to return to his office); that [the lead prosecutor] touched any juror; that [the lead prosecutor]] attempted to touch any juror; that [the lead prosecutor] invaded the space of the jurors; that [the lead prosecutor] was mouthing words at the jury; that [the lead prosecutor] was making suggestive, obscene, derogatory or threating hand signals to the jury; or, that [the lead prosecutor] engaged in any type of improper, indecorous, or otherwise wrongful conduct.

Addressing the affidavits from Chavez's family members, the district court noted:

> Each of these affidavits recounts how they viewed [the lead prosecutor] standing near the courthouse doors with arms folded and an "angry look" on his face. Each describes how [the lead prosecutor] walked down the sidewalk that leads to the parking lot in the same direction of the juror. The affiants then offer their own speculative interpretation of why they thought [the lead prosecutor] looked "angry" and [the lead prosecutor's] perceived intent behind the "angry look."

The district court noted that each of the family members had "a vested interest in imputing impropriety upon the State." Thus, the district court found that each of the affiant's "factual statements regarding the [the lead prosecutor's] physical location and body movements to be truthful, but the interpretation of those actions to be biased and inaccurate based upon the other evidence submitted in this matter."

As an alternative basis for its ruling, the district court reviewed the recorded interviews of the two jurors. The district court expressed great concern over the way the interviews were conducted, stating that it was "highly troubled by the overly suggestive and improper questioning implemented by Robinson during the interviews. Furthermore, such questioning included Robinson's misstatement of fact to the jurors in an attempt to persuade them to agree with Defendant's position." But even after putting aside its concerns and considering the interviews, the district court concluded that no outside influence was exerted on the jurors, and noted that neither of the jurors indicated that the lead prosecutor's conduct had any effect on deliberations or the verdict.[10] Thus, it similarly found that the interview evidence did not establish good cause to suspect juror misconduct.

The district court also reviewed the evidence submitted by the State, and after evaluating it, concluded that "[t]he weight of this evidence demonstrates that the [the lead prosecutor] was not glaring or staring down any jurors." Further, the district court also concluded that there had been "no evidence submitted to the [district court] that even remotely suggest[ed] that [the lead prosecutor] improperly influenced, or even attempted to influence, any member of the jury." Thus, considering evidence presented by Chavez alone, the district court concluded that there was no

---

[10] On appeal, Chavez briefly argues that the district court erred in considering statements from the jurors indicating that the verdict was not influenced by the lead prosecutor's conduct, contending that the evidence is barred under Idaho Rule of Evidence 606(b)(1). This argument fails for three reasons. First, the district court held the entirety of the recorded interviews to be inadmissible and addressed them only in an alternative ruling. Next, Chavez invited the error by presenting the evidence to the district court for consideration and cannot argue that the district court erred in doing so on appeal. Finally, Idaho Rule of Evidence 606(b)(2) allows a court to consider juror testimony regarding whether an outside influence was brought to bear on any juror.

24

good cause to suspect jury misconduct. Moreover, when additionally considering the evidence from the State, there was no evidence that the alleged underlying conduct occurred at all.

While the district court noted that it was "plausible" that the lead prosecutor had a countenance that was "neither pleasant, nor cheerful," the district court concluded that Chavez's argument was blind to the nature of trials in the real world.[11] The district court explained:

> [Chavez]'s argument seeks to ignore the reality of trial, specifically a murder trial, and what had been occurring in the courtroom for a period of nearly two weeks. The [c]ourt finds it plausible that [the lead prosecutor] had a look upon his face that was neither pleasant, nor cheerful. The fact that [Chavez]'s family members describe [the lead prosecutor]] as having an "angry look" is entirely unsurprising. However, the unbiased evidence before the [c]ourt reveals that [the lead prosecutor] did not stare down the jury. No allegations of any misconduct by any party, including any member of the prosecution, were made at any time during the trial or jury deliberations. [The lead prosecutor] was present in places he was permitted to be in the judicial building. [The lead prosecutor] utilized the sidewalk outside the judicial building to walk to the stairs that lead to his office in the Old Courthouse. There is no evidence of [the lead prosecutor] having any communication with the jury. There is no evidence of [the lead prosecutor] having any interactions with the jury. There was clearly no improper influence that was brought to bear upon any member of the jury.

Ultimately, the district court concluded that Chavez had not presented "any 'good cause'" for conducting an investigation into the jury's deliberations or verdict in [the] case." Moreover, the district court concluded that, "based upon the sheer paucity of evidence… [Chavez]'s motion is without any basis in law or fact."

Chavez argues that he is "not required to show the perceived external contact actually affected the verdict in order to show good cause to investigate . . . ." This argument is unavailing as the district court, after reviewing the evidence presented, concluded that there was no good cause to believe that any jury misconduct had occurred in the first place. On appeal, Chavez does not challenge the district court's factual findings; instead, he restates the facts and argues that the district court "did not act consistently with applicable legal standards." However, the district court applied the correct legal standard—the good cause test articulated in *Hall*. In applying that standard, the district court determined that Chavez did not present evidence establishing good cause to believe juror misconduct had occurred.

---

[11] The district court also noted that the lead prosecutor had very recently lost his father at the time of the trial, which may have understandably affected his general demeanor.

By failing to challenge the factual findings or point to error in the application of the legal standard in this matter, we conclude that Chavez has not shown that the district court abused its discretion. In his attempt to show good cause to investigate prosecutorial misconduct, Chavez could only point to a singular allegation that the lead prosecutor crossed his arms and stared at the jury with an unpleasant look on his face as they exited the courthouse. Based on the district court's careful reasoning as set forth above, the district court determined that Chavez failed to establish good cause and correctly rejected the motion for permission to further contact jurors. We affirm that decision.

## IV. CONCLUSION

For the foregoing reasons, Chavez's judgment of conviction and sentence are affirmed. Additionally, we hold that the district court did not err in denying the post-trial motion for permission to contact jurors.

Justices BRODY, ZAHN, and MEYER and Pro Tem Justice BURDICK CONCUR.